**MORGAN GUARANTY TRUST COMPANY, et al., Plaintiffs,**

v.

**HELLENIC LINES LIMITED, et al., Defendants.**

**No. 83 Civ. 8560 (RWS).**

United States District Court, S.D. New York.

Oct. 16, 1985.

202

Lord Day & Lord, New York City, for plaintiff Banks; John J. Loflin, J. Bond Smith, Jr., Matthew G. Dineen, John E. Grimmer, Jerry E. Muntz, of counsel.

Deorchis and Partners, New York City, by Manuel R. Llorca, for intervening plaintiffs; Burlingham Underwood & Lord, by Alfred E. Yudes, Jr., Bigham Englar Jones & Houston, by Helen M. Benzie, Gilbride Tusa Mirone Last & Spellane, by Robert Mirone, Quinn Ward & Kershaw, Baltimore, Md., by Kieron F. Quinn, John T. Ward, of counsel.

## OPINION

SWEET, District Judge.

The parties to this consolidated maritime action seek to establish the validity and priority of maritime liens asserted against certain Hellenic Lines Limited ("Hellenic")

vessels and their freights. Between April 29, 1985 and May 2, 1985 a hearing was held on the first of several contested issues, the validity of certain preferred ship mortgages asserted by plaintiffs Morgan Guaranty Trust Company of New York ("Morgan"), Continental Illinois National Bank & Trust Company of Chicago ("Continental"), National Westminister Bank USA ("Natwest"), and Banque de la Societe Financiere Europeenne ("BSFE") (collectively, "Plaintiff Banks"), and an additional mortgage asserted by Morgan and SFE Banking Corporation Limited ("SFE"), all under 46 U.S.C. § 951. On the following findings of fact and conclusions of law, the mortgages are held to be valid foreign preferred ship mortgages pursuant to 46 U.S.C. § 951.

**Prior Proceedings**

Plaintiff Banks brought this action under 46 U.S.C. § 951 as alleged registered mortgagees of eleven Greek flag vessels, ten of which were owned by Hellenic and one of which was owned by Universal Cargo Carrier, Inc. ("Universal"), a Panamanian corporation affiliated with Hellenic, seeking to foreclose their alleged mortgages against three vessels owned by Hellenic, the M.V. HELLENIC IDEAL ("IDEAL"), M.V. HELLENIC INNOVATOR ("INNOVATOR") and M.V. HELLENIC STAR ("STAR"). These mortgages had been given as partial security for an $80 million Revolving Credit Facility and Term Loan of March 31, 1983. The vessels were arrested in New York during November of 1983. In addition, Morgan and SFE brought an action against the M.V. HELLENIC SPIRIT ("SPIRIT") owned by Transpacific Carriers Corporation ("Transpacific") to enforce a separate mortgage given by Transpacific as security for a Guarantee and Foreign Exchange Facility Agreement given to secure the purchase of the vessel. The SPIRIT was arrested in New York on December 10, 1983. The ships were sold at auction pursuant to a court order of February 3, 1984, and the funds thus generated were held subject to further order of the court.

Pursuant to the claims of Greek creditors, Hellenic was declared a bankrupt in Greece on May 30, 1984 by judgment number 259/1984 of the multi-member Court of First Instance of Piraeus, Greece. Hellenic and Transpacific filed for reorganization under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 et seq., on December 12, 1983 in the Southern District of New York. On January 20, 1984, Bankruptcy Judge Burton Lifland ordered that the automatic stay be lifted so that any party could proceed with actions in rem against the mortgaged vessels and their freights.

Various parties, including the Mobil Oil Corporation, two container financiers, Grindlays Bank p.l.c. (London) ("Grindlays"), and Banque de Paris et des Pays-Bas (Suisse) S.A. and Paribas (Bahamas) Limited (collectively "Paribas"), certain container leasing companies (collectively, the "Container Claimants"),[1] and certain others who collectively contested the validity of the mortgages at issue for the purpose of maritime lien priority determination, intervened in these foreclosure actions. The actions against the IDEAL, INNOVATOR, SPIRIT and STAR were consolidated by an order of this court dated August 24, 1983. In addition, because certain payments of freight were deposited in this court as a result of specified voyages of additional ships of Hellenic, mortgages on the following vessels are also challenged before the court: M.V. HELLENIC VALOR ("VALOR"), M.V. HELLENIC PRIDE ("PRIDE"), M.V. HELLENIC EX-

---

**1.** The container leasing companies constituting the Container Claimants are as follows: CATU Containers, S.A. ("CATU"); Gelco CTI Container Services, Inc., formerly CTI Container Leasing Corporation ("CTI"); Flexi-Van Containers/Chassis, a division of Flexi-Van Leasing, Inc. ("Flexi-Van"); ICCU Container Fleet Management, S.A. and ICCU Containers, S.P.A. (collectively "ICCU"); Interpool Limited ("Interpool"); Itel Containers International Corporation ("Itel"); Nautilus Leasing Service, Inc. ("Nautilus"); Nippon International Container Services Co. Ltd. ("Nippon"); SeaCo Inc. ("SeaCo"); Shirlstar Container Transport Limited ("Shirlstar"); Transamerica ICS, Inc. ("Transamerica"); Transocean Leasing Corp. ("Transocean"); Triton Container International Ltd. ("Triton"); World Freight Ltd. ("WFL").

PLORER ("EXPLORER") and M.V. HELLENIC CHAMPION ("CHAMPION"). Maritime lien claims are asserted against those freights.

A Special Master, Eliot H. Lumbard, Esq. ("Special Master") was appointed by the court to assist in the pretrial preparation and preliminary ordering of the various maritime lien priorities for the numerous claims asserted against the vessel sale proceeds and freights held for distribution by this court in the exercise of its admiralty jurisdiction. It was determined that the issues for trial would be separately ordered and presented.

The initial issue of the validity of the mortgages and thereby the eligibility of the mortgages to qualify as maritime liens for the distribution, rather than being left to bankruptcy claims only, was presented by skilled counsel at a bench trial between April 29, 1985 and May 2, 1985. A subsequent issue, the validity of the claims of container claimants asserting maritime liens was heard upon evidence and argument on August 12, 1985. Final submission of briefs and proposed findings and conclusions was set for October 4, 1985.

However, the container interests except for Paribas Suisse and Grindlays reached a settlement dated August 8, 1985 with the Plaintiff Banks after the initial trial, contingent upon the court's approval of the payment of the settlement amounts out of the funds held subject to the court's direction. Subsequent to the hearing on the container issue on August 12, 1985, the Plaintiff Banks, Paribas Suisse and Grindlays, also reached a settlement on September 30, 1985 on the container claims. On September 30, 1985 the court approved the payment of the settlement amounts out of the INNOVATOR funds, there remaining sufficient amounts to satisfy the remaining maritime claims against that ship.

Mobil and other claimants continue to challenge the validity of the mortgages. Because of these challenges, as well as the rights of claimants ranking behind the Plaintiff Banks, the issue of the validity of ship mortgages remains until today alive and well and is not mooted by the settlement.

**Facts**

The following facts were established by the evidence presented. Hellenic and its affiliated companies, Transpacific, Universal and Hellenic-American Agencies, Inc. ("HAA") (collectively, "the Hellenic Group"), operated a regularly scheduled Greek flag liner service from ports on the East and Gulf coasts of the United States to ports in the Mediterranean and Middle East, as well as from Europe to the Mediterranean and Middle East. Hellenic was primarily a container operation carrying cargo in an east and west bound pattern in container boxes. In addition, it had some smaller vessels known as break bulk carriers. Hellenic owned and operated the Greek flag vessels IDEAL, INNOVATOR, STAR, CHAMPION, EXPLORER, PRIDE and VALOR. Transpacific was the registered owner of the SPIRIT which was operated and managed by Hellenic as part of its fleet.

Hellenic maintained a banking relationship and checking accounts with both Morgan and Continental. Prior to the execution and recording of the mortgages at issue in this case, there were unsecured lines of credit at both banks and there were loans outstanding to Hellenic from each bank in the sum of $24 million secured by mortgages on various vessels. In addition, each bank had other term loan agreements with Hellenic secured by marketable securities. By the fall of 1982 Morgan and Continental were Hellenic's primary banks.

**The $80 Million Refinancing**

In the fall of 1982, Hellenic contacted Morgan to arrange a refinancing of approximately $69.80 million of fixed term debt held by Morgan and Continental.[2] Hellenic had been suffering from cash flow problems which were expected to increase and had failed to reduce the outstanding bal-

---

**2.** Although the Intervening Plaintiffs characterize the debt as $73.6 million a review of the trial documents and testimony shows that $69.8 is the more accurate number.

ances of its revolving unsecured lines of credit. It sought to increase its liquidity by refinancing in a manner that would provide additional credit for working capital and allow it to defer payments temporarily on the principal of its loans. These overtures for refinancing were made on behalf of Gregory Callimanopoulos ("Callimanopoulos"), the son of the founder of the company, Pericles Callimanopoulos ("Pericles") and owner of the majority of Hellenic stock. Morgan rejected Hellenic's initial proposal because it believed additional infusions of capital from the principal owner in particular were needed to give Hellenic sufficient relief.

No injection of capital from Hellenic shareholders was forthcoming. In early 1983, as Hellenic's condition worsened, Hellenic and the Banks agreed upon a major financial restructuring in the sum of $80 million which would provide $10 million of new credit for operating expenses. In pursuit of this plan, officials of Hellenic contacted additional banks and obtained commitments from Natwest and BSFE for loans of $5 million each. Of the remaining $70 million sum, Morgan committed $40 million and · Continental $30 million. Management of the refinancing was overseen by Morgan, which also became agent for the bank syndicate. The loan was to be secured by mortgages on 11 ships (the "syndicate vessels"), of which 7 had previously been mortgaged to Morgan and Continental and 4 were previously unencumbered vessels. In addition to the mortgages previously issued, Hellenic had pledged marketable securities to Morgan and Continental for its prior loan facilities. Under the $80 million revolving credit facility it was agreed that although these securities were to be pledged to the banks, they could be released to Hellenic by the banks depending on the value of the vessels. These values were to be redetermined periodically. The banks also agreed to give Hellenic a two year moratorium on repayment of both the refinanced debt and the additional loan amounts, after which the debt would be converted to a six-year term obligation with quarterly payments. In anticipation of this portion of the agreement, the banks allowed Hellenic to pass payments due in February and March of 1983.

### Execution of the Mortgages Other Than the SPIRIT Mortgage

By late March, 1983, there was a commitment letter to provide the $80 million loan. This became formalized as a Revolving Credit and Term Loan Agreement, dated as of March 31, 1983 (the "March 31 Agreement"). Individual ship mortgages were to provide the underlying security for the loans. April 28, 1983 was selected as the date for execution of the term loan agreement, the mortgages on the Hellenic vessels selected for this purpose, and related documents, and May 3 was to be the date for funding the loan. The firm of Mayer, Brown & Platt, which regularly represented Continental and acted as counsel in this transaction for the Plaintiff Banks, initially drafted the mortgage instruments for execution in Greece and subsequently revised them for execution by all parties in New York on April 28, 1983 as preferred ship mortgages under Greek law. The mortgage documents contained notarial acknowledgments of the execution by the signatories and a notarial affidavit of good faith for the mortgagor.

Under the original refinancing proposal, which assumed the mortgages would be executed in Greece, they would have been executed in so-called "notarial" form. Under Greek practice, this means the notary would have a role more extensive than that in the United States, including participation in the preparation and execution of the mortgages. In addition, the notary would have become the official depository of the original of these documents, rather than a government office.

The execution ceremony was held in New York on April 28, 1983, at the office of Mayer Brown. Each of the syndicate banks signatories signed ten copies of the respective mortgages for each syndicate vessel. Ms. Randee Ammon ("Ms. Ammon"), a Vice President of Morgan, signed on its behalf and on behalf of BSFE, pursu-

ant to a power of attorney. Charles Yao signed on behalf of Continental and Nicholas Gumprecht signed on behalf of Natwest.

On April 19, 1983, the Hellenic Board of Directors by resolution had authorized Mr. Tassos Pitenis ("Pitenis"), as its representative, to execute the necessary documents associated with this transaction. Mr. Theo Sioufas ("Sioufas"), a Greek attorney who was consulted by Mayer, Brown on issues of Greek law relating to the transaction, on the morning of April 28 advised Mr. R. Theodore Ammon ("Mr. Ammon"), the Mayer Brown partner in charge of the matter, that Mr. Pitenis should not sign the mortgages until Hellenic's Board also granted him a notarial power of attorney under Greek law. Sioufas was under the impression that the mortgage instruments would be notarial acts, in which event under Greek law Pitenis' authority would have to be in notarial form. This procedure would have been followed had the documents been executed in Greece. Sioufas recommended that the execution of the mortgages by Pitenis should be deferred until the Hellenic Board of Directors could meet and authorize one of its directors to issue such a notarial power of attorney to Pitenis. Mr. Ammon acceded to this proposal. Accordingly, at the signing on April 28, Pitenis was asked to sign only eight copies of each mortgage. Two copies of each mortgage, referred to in the testimony as the "control copies," were reserved for his signature on May 2 after the notarial power of attorney had been executed in Greece, as authorized by the Hellenic Board. Pitenis also signed eight copies of each affidavit of good faith accompanying the mortgages, two copies also having been reserved for signature on May 2, the anticipated mortgage registration and funding date.

At trial, Mr. Ammon testified that on April 28 as each signatory entered the area of Mayer, Brown's office where the documents had been lined up in preparation for execution, he introduced the signatory to the two notaries public who were present to witness the signing ceremony,

Elizabeth Pantelis and Evelyn Dalmeda, both of whom were otherwise employed as secretaries in his office. Mr. Ammon further testified that in his introduction, he informed the notaries as to the identity of each respective signatory and stated that he or she would be executing the document on behalf of a particular bank or on behalf of the borrower, Hellenic. The signatories were advised that the notaries would take their acknowledgments and in the case of Pitenis, would also subscribe his affidavit of good faith. No oaths were administered to the signatories. The notaries were instructed to execute the notarial jurats with the dates in blank.

Mr. Ammon assigned the task of attending to the dating of the mortgages and acknowledgments and the affidavits of good faith to a Mayer Brown associate attorney, Ian Coles ("Coles"), working with him on those transactions. Pursuant to Mr. Ammon's instruction, Coles dated each mortgage, on its first page, May 3, 1983, which was to be the date of closing (i.e., the date of registration of the mortgages in Greece and the funding of the loan in New York).

In Piraeus, Greece, on May 2, the Hellenic Board met and authorized the issuance of a power of attorney to Pitenis in notarial form. This was formalized, and the documents immediately were inspected by Sioufas in Greece who then telephoned Mr. Ammon to report that he was satisfied with the evidence of Pitenis' authority. In New York, on the morning of May 2, Pitenis returned to the offices of Mayer, Brown, and in the presence of the same two notaries to whom he had been introduced on April 28, executed the remaining two copies of each of the mortgages as well as the affidavits of good faith for each of those mortgages. The notaries then signed the acknowledgments and the jurats on the affidavits.

Upon examining the documents executed by Pitenis, Mr. Ammon discovered that his associate Coles had misunderstood his instructions and had dated the acknowledg-

ments of Pitenis' signature and affidavits of good faith May 3. He instructed Coles to correct the date to May 2. This was done. Mr. Ammon was unaware at that time, however, that Coles had dated each of the acknowledgments for the bank signatories May 3 as well. Unknown to him, Coles then changed each of those acknowledgments to read May 2, which was, of course, the correct date for Pitenis but incorrect for each of the bank signatories, who in fact had signed on April 28. None of the alterations are initialed.

The fully executed mortgages with acknowledgments and affidavits of good faith were taken from Mayer, Brown's offices to the New York County Clerk's offices where certificates were attached attesting to the good standing of the notaries who signed the affidavits and acknowledgments, and from there the documents were taken to the Greek Consulate in New York which attested as to the standing of the County Clerk. After consularization, the two control copies of each mortgage were taken to Kennedy Airport and turned over to Pitenis who flew with them overnight to Athens.

Upon his arrival in Greece, Pitenis had the mortgages delivered to the offices of Sioufas in Piraeus on the morning of May 3. Later the same day, Sioufas completed the necessary forms for recording the mortgages, and they were registered at the appropriate ship registry, the public registry of the Department of Ship Registries and Naval Mortgages at the Central Port Authority of Piraeus, Greece. Sioufas then advised Mr. Ammon that registration was complete. Mr. Ammon in turn notified Morgan, and Morgan made the funds available to Hellenic. Hellenic immediately drew a substantial part of the $80 million and made subsequent withdrawals through the summer of 1983 until the entire $80 million was taken down.

The $80 million revolving credit facility refinanced Hellenic's existing debt of $69.80 million to Morgan and Continental. It enabled Morgan and Continental to eliminate approximately $7 million in unsecured debt. According to the Plaintiff Banks, Hellenic also obtained the release of some $7 million in securities which had been pledged previously to secure its debts prior to the refinancing and obtained a two-year moratorium on the repayment of principal of the refinanced debt, without which Hellenic would have been required to repay approximately $32 million during such two-year period. The Plaintiff Banks allege that the new structure was intended to provide sufficient working capital so that Hellenic could survive the recession and continue its business. The Intervening Plaintiffs contend that the refinancing was intended to allow the banks to extend their security interest into further assets of Hellenic and reduced Morgan's credit exposure by over $18 million. The Intervening Plaintiffs also contend that at the time the loan was made, Hellenic had defaulted under the credit facility because its net worth was less than required in the loan agreement, and that the banks were aware of this default.

### Authority of the Hellenic Board

Control of Hellenic and its Board of Directors was the subject of extensive litigation following the death of Pericles Callimanopoulos in September 1979. Pericles bequeathed roughly a 60% stock interest in Hellenic to his son, Gregory Callimanopoulos, and the 40% remainder interest to his widow and three daughters. The will was contested by his widow and daughters, and a dispute also arose concerning the election of the Hellenic board which took place in 1979 after Pericles death. Early in 1982 the Court of First Instance of Piraeus, Greece, by judgment No. 352 of 1982, clarified by judgment No. 871, invalidated the 1979 election and appointed a provisional Board of Directors for the purpose of convening a general assembly of the Hellenic shareholders to elect a new Board. The Court also appointed an administrator of the shares owned by all of Pericles' heirs and subsequently advised him how to vote the shares. In April of 1982 a new Board was elected at an extraordinary General Meeting of Hellenic's Shareholders in ac-

cordance with the Greek Court's order. Following a challenge to that board by dissident shareholders, the court reaffirmed the authority of its administrator. A Shareholder's Agreement was entered into on May 31, 1982 between Callimanopoulos heirs providing for the distribution of voting rights among the heirs. In accordance with that agreement, another board was elected on June 1, 1982. This Board was in office in 1983 when Pitenis was authorized to sign the mortgages. All family litigation relevant to the issues before this court have been resolved. There has been no legal challenge in Greece to the validity of the Board since May 31, 1982.

### The SPIRIT Mortgage

Subsequent to the transaction just described, Morgan entered into another mortgage involving the M/V HELLENIC SPIRIT, owned by Transpacific. In early 1982 representatives of Hellenic had asked Morgan if it would be a guarantor of a loan to be obtained from two French banks, Banque Louis Dreyfus and Morgan & Cie, in connection with the purchase of the SPIRIT, then owned by a French company. Morgan indicated a willingness to participate as guarantor of the loan amount and of the French franc exchange rate underlying the transaction. SFE, a subsidiary of BSFE, agreed to join Morgan as a guarantor. Morgan was to guarantee 60% and SFE 40% of the amount of the loan, which was $5.635 million. The purchase price of the SPIRIT was $8.05 million. It was the obligation of Morgan and SFE under a Guarantee and Foreign Exchange Facility dated July 29, 1983, to pay the two French banks in the event Transpacific failed to repay its loan when required, as well as to provide a foreign exchange facility, which in essence guaranteed a French franc exchange rate to Transpacific. Morgan and SFE did not provide any money for the purchase of the vessel.

On September 8, 1983, as security for the guarantees, a mortgage on the SPIRIT in favor of Morgan and SFE was executed in New York. This mortgage was prepared by Lord, Day & Lord, counsel to Morgan and SFE, in consultation with Greek counsel, Dimitri Astras ("Astras"). Ms. Ammon signed the mortgage on behalf of Morgan. Clayton Rose, also a Morgan officer, signed on behalf of SFE, by a power of attorney. William Mays, an attorney from the firm of Poles, Tublin, Patestides & Stratakis, signed on behalf of Transpacific, a Panamanian corporation, pursuant to authority granted by its Board of Directors and ratified by its shareholders. The signatories were introduced to the notary public, Irving Spielman. Mr. Spielman was told on whose behalf each signatory would sign the mortgage, and the signatories were told that Mr. Spielman would take their acknowledgments and, in the case of Mr. Mays, would also attest to his affidavit of good faith. Once again, no oaths were administered.

Following execution by all parties, the mortgage was sent to Astras for recording in Greece. On September 12, 1983 Morgan and SFE issued their guarantees to the French banks, Transpacific acquired title to the vessel with the credit thus made available, and Mr. Astras recorded the mortgage in Piraeus, Greece. The covenants in the guarantee and foreign exchange facility on the SPIRIT are exactly the same as those under the $80 million revolving credit facility including a "cross default provision" so that if any of the Hellenic group defaulted in the payment of any debt obligation to any party to which the group had debt obligations, it was a default under the security agreement. There was, however, no cross-collateralization provisions between the two transactions.

### Hellenic's Financial Situation

In 1982, there was a general recession in international trade, particularly in the routes served by Hellenic. Oil prices had dropped, affecting the ability of a number of countries in the Middle East to continue importing goods from the West at their previous rate. Hellenic was particularly affected by these developments because it had been engaged in a program of converting much of its break-bulk cargo fleet to

larger and more capital intensive container and roll on—roll off vessels. For these services Hellenic had entered into an expensive program of owning and leasing thousands of metal box containers for cargo shipments. These major business and financial developments were undertaken in anticipation of an increase in trade between the West and the OPEC countries. Hellenic's revenues declined during this period, and the picture worsened during the summer of 1983 when freight rates dropped precipitously and competition increased for the reduced amount of cargo available. There was no forecast of change in these conditions.

Beginning in 1981, Hellenic reported, on a book basis, a negative net worth. While the entire Hellenic Group had a negative cash flow in 1983, the Group retained sufficient marketable assets to continue to pay its creditors on a regular, although consistently late, basis until November 1983. Most, if not all, of the Intervening Plaintiffs here continued to receive payments until November 1983. Late payment had been standard for Hellenic for an extended period of time.

Hellenic made its first payment of interest due under the March 31 Agreement in August 1983. The next interest payment was due on November 3, 1983. As that date approached, it became evident that Hellenic would not be able to meet this $2.4 million payment. By the summer of 1983, Hellenic had drawn down the entire $80 million.

In mid-November, representatives of the Hellenic Group met with representatives of the syndicate banks, and Hellenic proposed that the banks provide additional funds in the amount of $10 million to carry the company over the next few months. Other alternatives were also explored. For some time the banks had suggested that Hellenic's financial picture would be improved if certain of its vessels could be sold. Callimanopoulos advised the banks that he had offered these vessels to the government of Saudi Arabia and hoped they would purchase them. He also advised the banks that attempts were being made to obtain support, including additional funds from the government of Greece or possible purchase of some or all of the line by the Greek Government. The banks urged Callimanopoulos to provide additional funds from his own resources, as he had been requested to do in the past.

As it turned out, none of these proposals was accomplished. The Saudis did not buy the ships, the Greek government did not offer the new funds, and Callimanopoulos declined to pay any additional funds into the company from his own resources. By late November, after Hellenic had been in default under the March 31 Agreement for approximately 20 days, the banks sent a notice of default to Hellenic and began arrest and foreclosure proceedings on the syndicate vessels.

When Hellenic failed to make the interest payment due on November 3, this was also an event of default under the mortgage of the SPIRIT. The French banks who financed the purchase of the SPIRIT demanded payment. Upon default of Transpacific, they turned to the two guarantors, Morgan and SFE, for payment of the amounts guaranteed. These amounts, in the total sum of $5.635 million, were then paid by the guarantors to the French banks. On December 1, 1983, the SPIRIT was arrested in New York by other claimants. On December 12, 1983, the SPIRIT was also arrested by Morgan and SFE. Later on December 12, 1983, Hellenic and its related companies sought relief under Chapter 11 of the Bankruptcy Code by filing petitions in the Southern District of New York.

Actions have been commenced by the Plaintiff Banks against the Hellenic vessels in Greece.

**The Issues**

The Intervening Plaintiffs challenged the validity of the Plaintiff Banks' mortgages on several grounds. They first contended that the mortgages fail to meet all of the requirements of execution and registration necessary under 46 U.S.C. § 951 for the creation of a United States preferred ship

mortgage. Second, they asserted that the Plaintiff Banks have failed to establish the authority of those persons authorizing and executing the mortgages on behalf of Hellenic. Finally, they contended that the mortgages should be declared void as fraudulent conveyances or as the conveyances of a bankrupt debtor. Although the Intervening Plaintiffs challenged both the syndicate mortgage and the SPIRIT mortgage on the same grounds, they will be addressed separately.

In reaching a determination on these issues, many of which were of considerable difficulty, this court was aided by not only the skill and ability of counsel and the diligence and proficiency of the Special Master, but also the well-reasoned and thorough opinion of the Honorable Morey L. Sear in *M/V Grigorious C.IV*, 615 F.Supp. 1444 (E.D.La.1985), a case involving the validity of a companion mortgage given by Hellenic to the Plaintiff Banks under the same factual circumstances and presenting identical issues.

### Execution and Registration of the Syndicate Mortgages

The United States Ship Mortgage Act, 46 U.S.C. §§ 911 *et seq.* (the "Act") established the maritime lien status of a preferred mortgage and conferred exclusive jurisdiction to enforce the lien on the United States District Courts in admiralty. As originally enacted, the Act applied only to United States flag vessels and required that both the mortgagee and the mortgagor be United States citizens. In 1954 the Act was amended and extended to foreign flag vessels. Mortgages on foreign flag vessels may now acquire preferred maritime lien status and be foreclosed in admiralty proceedings in a United States court.

Title 46 of U.S.C. § 951, the amendment to the Act, provides in relevant part:

Foreign ship mortgages: As used in sections 951 and 954 of this title, the term "preferred mortgage" shall include, in addition to a preferred mortgage made

pursuant to the provisions of this Chapter, any mortgage, hypothecation, or similar charge created as security upon any documented foreign vessel (other than a towboat, barge, scow, lighter, car float, canal boat, or tank vessel, of less than 200 gross tons) if such mortgage, hypothecation, or similar charge has been duly and validly executed in accordance with the laws of the foreign nation and has been duly registered in accordance with such laws in a public register either at the port of registry of the vessel or at a central office; and the term "preferred mortgage lien" shall also include the lien of such mortgage, hypothecation or similar charge.

Despite the detailed formalities required for execution of a mortgage on a United States vessel, a mortgage on a foreign vessel has only two requirements: (1) it must be "validly executed in accordance with the laws of the foreign nation" and (2) it must be recorded "in a public register." 46 U.S.C. § 951. The Act does not require that foreign flag vessel mortgages comply with the provisions relating to execution that are applicable to United States preferred mortgages. A United States preferred ship mortgage must meet the requirements of 46 U.S.C. §§ 921–26, which include proper acknowledgment of all signatures and affidavits of good faith.

### Greek Law

■ Since foreign law determines the validity of foreign ship mortgages under § 951, the validity of the Plaintiff Bank's mortgages will depend on whether they were validly executed and duly registered according to the laws of Greece.[3] The Plaintiff Banks bear the burden of establishing that the mortgages complied with the requirements of Greek law. *Morse Drydock Co. v. Northern Star*, 271 U.S. 552, 46 S.Ct. 589, 70 L.Ed. 1082 (1926), and thereby qualify the Plaintiff Banks to the appropriate maritime lien priority.

---

**3.** The Intervening Plaintiffs do not dispute that the mortgages create security interests in the vessels in favor of the Plaintiff Banks.

■ Greek law provides for a simple ship mortgage, which when duly executed and registered creates rights *in rem* against the vessel and rights against third parties, and a separate preferred ship mortgage, which gives the mortgagee, in addition to the above rights, the right upon default either to take over the management of the vessel and pay the sums due out of the proceeds of operating the vessel or to sell the vessel by private or public sale without conforming to the procedures otherwise required by the law. The preferred ship mortgage was created in 1953 as part of an effort to encourage foreign investment in Greece.

In order for a document to rise to the status of a Greek preferred ship mortgage, it must contain the requisite formal and substantive provisions and be recordable under Greek law. The highest Greek law governing preferred ship mortgages, Legislative Decree No. 3899 of 1958, provides in Article 2 that a preferred ship mortgage can be created within Greece only through a specific formal instrument. When a preferred ship mortgage is executed outside of Greece, however, Article 2 permits the instrument to be in the "form required by the law of the country in which the agreement is executed."

In addition, upon registration of each vessel in issue in this case, an individual Ministerial Decree was promulgated setting forth both the procedural requirements for execution of a preferred ship mortgage and the substantive rights of the mortgagee.[4] The Ministerial Decrees are of constitutional stature and control in case of conflict with any other legislation. Under the Ministerial Decrees, if a preferred mortgage is executed in Greece, it must be signed before a Greek notary public, but if it is signed abroad, it may be executed "in accordance with the form required or permitted by the law of the place of signing." Ministerial Decrees Article 19, Banks Exhibits 10(a)–(g), 73, par. 19.

Thus, although the substantive validity of the Hellenic mortgages is an issue to be determined solely under Greek law, the procedural formalities of the mortgages under the circumstances before the court must be evaluated in accordance with the requirements of the applicable United States laws. While § 951 requires this court to consult Greek law in determining the validity of these mortgages, Greek law mandates the consideration of United States laws as to the formal requirements for execution.

■ The parties do not contest the validity of the substantive provisions of the Hellenic mortgages. As to the procedural requirements, however, the Intervening Plaintiffs contend that the mortgages were not properly executed in accordance with the applicable United States laws. The preliminary issue raised is what law constitutes "the law of the place of signing" within the meaning of Article 19 of the Ministerial Decrees. The Intervening Plaintiffs contend that Greek law requires that a Greek preferred ship mortgage signed outside of Greece be executed either before a Greek consul or in the form required or permitted by the country of execution for a mortgage creating the same legal consequences as Greek preferred ship mortgages.

Under the Intervening Plaintiff's theory, the execution of the Hellenic mortgages required the formalities required under 46 U.S.C. §§ 921–26, the statutes governing the execution of United States preferred ship mortgages. The Plaintiff Banks, on the other hand, contend that a Greek preferred ship mortgage need only be executed with the formalities required or permitted for the creation of a security interest in a vessel at the place of execution, rather than the formalities necessary for a security interest rising to the level of a maritime lien in that place. Under the Plaintiff Bank's theory the mortgages would only need to have been executed

---

**4.** Although a separate Ministerial Decree applies to each vessel, the relevant substantive provisions of each Decree are identical and they will be referred to jointly as "the Ministerial Decrees."

with the limited formalities necessary under New York law and 46 U.S.C. § 951 to create a valid common law ship mortgage. All agree that the mortgages failed to fully comply with all of the technical requirements for a fully qualified United States preferred ship mortgage under 46 U.S.C. §§ 921–26, although the Banks contend that the manner in which the documents were executed constitutes substantial compliance with the statutes.

The actual language of Article 19 of the Ministerial Decrees provides no guidance as to whether the Greek legislature intended a Greek ship mortgage executed in a foreign country to comply with the formalities required of any valid mortgage or instead to comply with the formalities required of a mortgage creating the same legal rights as a Greek preferred ship mortgage. At trial, the Intervening Plaintiffs' expert in Greek law, Mr. Basil Patkos ("Patkos"), testified that Greek courts will look to the form of document that creates the same legal consequences and rights *in rem* under United States law as does a Greek preferred mortgage. He also testified that all Greek preferred mortgages executed in the United States with which he has had experience have been executed following the form requirements for United States preferred ship mortgages. Patkos' testimony was supported by the prior trial testimony of another Greek law expert presented by the Intervening Plaintiffs, Mr. Kalamiotis ("Kalamiotis").

The Plaintiff Banks, however, presented several witnesses as experts in Greek law, including Astras, Sioufas, Mr. Paul Avrameas ("Avrameas") and Professor A.R. Yiannopoulos ("Yiannopoulos"), who testified that because the laws governing Greek preferred mortgages executed abroad were specifically promulgated to encourage foreign investment in Greek shipping, they were intended to be liberal and to permit the recording of any foreign security interest in a vessel which is validly executed in the place of signing. The Banks note that the United States law governing the enforceability of security interests in vessels recorded abroad, 46 U.S.C. § 951, is sim-

ilarly premised on a policy of encouraging investment by providing protection for foreign lenders and, accordingly, is liberally construed and does not require that a mortgage have preferred status or even maritime lien status in its own country to be entitled to preferred status in an American court. *See* Gilmore & Black, *The Law of Admiralty*, pp. 700–701; *State of Israel v. M/V Nili*, 435 F.2d 242, 252 (5th Cir.1970), *cert. denied*, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (1971); *European American Banking Corp. v. M/V ROSARIA*, 486 F.Supp. 245, 254 (S.D.Miss.1976). The Banks also argue that because the Ministerial Decrees are applicable with respect to mortgages executed in countries where the Greek concept of a preferred ship mortgage, *i.e.*, a mortgage which permits the mortgagee to assume management and control of the vessel upon default, is unknown, the Intervening Plaintiffs' theory would make it impossible for a valid Greek preferred mortgage to be executed in those countries.

In *Morgan v. M/V Grigorious C.IV, supra,* the district court adopted the reasoning of the Plaintiff Banks. The court based its decision on the fact that Kalamiotis' testimony, the only testimony presented by the Intervening Plaintiffs in that case, was neither as clear nor as supported by the authorities as the testimony presented by the Banks. In addition, the court found persuasive the fact that the Bank's interpretation of Greek law is consistent with the interpretation accorded § 951 in the United States. Slip op. at 13–14. Based on the evidence presented in the case at hand, however, the Intervening Plaintiff's interpretation of the requirements of Greek law more closely represents the intention of the Greek legislature in permitting the execution abroad of Greek preferred ship mortgages.

The testimony of Patkos and Kalamiotis as experts in Greek law is persuasive, though it is apparent that this issue is faced here and in *Morgan v. M/V Grigorios C.IV* for the first time. It was the view of these experts that the Greek legislature,

no matter how intent on raising foreign capital, did not intend to allow parties executing a Greek preferred ship mortgage abroad to look to the form of a document that creates no rights against third parties. Although a reading of Article 19 which requires that the parties follow the form of whatever document creates the exact equivalent to the Greek form of preferred mortgage is equally untenable, given the limited number of countries recognizing such a concept, the fact that under Greek law both simple and preferred mortgages create rights *in rem* and rights valid against third parties suggests that at a minimum the document to be looked to should be one creating such basic rights.

The Plaintiff Banks analogy to the liberal interpretation accorded 46 U.S.C. § 951 is relevant but fails to alter the conclusion reached under Greek Law. Section 951 is intended to guarantee that any valid foreign ship mortgage, no matter what its substantive provisions, will have the same status before a United States court as a valid United States ship mortgage. Because § 951 does not impose any requirements as to substance on foreign ship mortgages, the imposition of a procedural requirement dependent on the substantive provisions of a document, in particular a requirement that the foreign document be executed as if it were a preferred mortgage in that country, would be illogical. Article 19, on the other hand, according to the Plaintiff Banks own witnesses, simply provides an alternative method of formalizing a document that must still contain the appropriate substantive provisions required by Greek law to create a Greek preferred ship mortgage. Since the Greek law does not allow for any latitude as to the substance of a Greek preferred ship mortgage executed abroad, it is logical that the legislature would have intended the foreign document whose formalities were adopted for execution abroad to be one containing similar provisions, so as to ensure an equivalent level of safeguards and protection against fraud for those third parties against whom the mortgage would be enforced. Such a conclusion is not inconsistent with the premise that the Ministerial Decrees were intended to encourage an influx of capital into Greek shipping, since it permits lenders to ignore the potentially alien Greek notarial act requirements in favor of procedures commonly used in their own country.

Furthermore, even if the Bank's argument as to the liberality of the requirements of the Greek Ministerial Decree were accepted, one of the Bank's own expert witnesses, Professor Yiannopoulos, testified that once a particular form of execution is chosen, Greek law mandates that the requirements of that selected form must be carried out. Although Professor Yiannopoulos went on to state that in his opinion the parties to the mortgage agreements were purporting to follow the formalities of the State of New York and not the formalities of the preferred ship mortgages under United States federal law, he agreed that the formalities followed were compatible with the forms for a United States preferred mortgage. His opinion appeared to be based on the fact that the documents differed substantively from a United States preferred mortgage, a factor which is not relevant to the issue of choice of formalities.

The evidence at trial establishes that the mortgages were intended to be executed with the formalities required for a United States preferred ship mortgage in accordance with the common practice for Greek preferred ship mortgages executed in the United States. According to Professor Yiannopoulos, Greek law requires that the documents be executed in accordance with the chosen form even if a lesser form might be permitted.

**Requirements of §§ 921–926**

■ The above conclusion requires an examination of the manner in which the mortgage documents were executed in light of the requirements for execution in the United States of a United States preferred ship mortgage. §§ 921–26 of the Ship Mortgage Act set forth the conditions, requirements and formalities required for a

mortgage to acquire the status of a preferred maritime lien affecting the rights of third parties. The particular formalities at issue in the present case include the requirements that affidavits of good faith be included with a mortgage, § 922(a)(3), and that a mortgage be acknowledged before a notary public before recording. § 926(b).[5] Although United States law governs the question of what formalities must be included, the issue of whether the required formalities were appropriately carried out is governed by New York law, since federal law does not specifically cover the question of the proper execution of the duties of a notary public.

The Intervening Plaintiffs contend that the mortgages failed to comply with the requirements of the Ship Mortgage Act because as a matter of New York law they were improperly executed. According to the Intervening Plaintiffs, the defects in the formalities consist of the failure of the notary public to administer oaths and the improper and incomplete dating of the notarial jurats.[6] The form of acknowledgment selected by the Plaintiff Banks was both an acknowledgment and an affidavit. The acknowledgment itself specifically required the swearing of each signatory before the notary. It is conceded that no oaths were administered at the signing of any of the mortgages.

■ Although Ms. Ammon testified on behalf of the Banks that it was not customary to administer oaths at ship mortgage closings, his testimony was persuasively contradicted by Patkos, who stated that oaths were administered at numerous closings in New York at which he was in attendance. It is also conceded that on the instruction of Plaintiff Banks' counsel the dates were not filled in by the notary at the time of signing and that subsequently the

dates were improperly filled in and then changed, without initialing, by one of the Banks' counsel. According to the Intervening Plaintiffs, these failures are particularly egregious because the instruments sought to create preferred rights and at least as far as the improper dating is concerned, the errors were intentionally committed by counsel and should have the effect of rendering the acknowledgments and affidavits invalid.

According to the Plaintiff Banks, the lack of a formal swearing and the misdating of the notarial acknowledgments were simply informalities in no sense fatal to the validity of the acknowledgment. They urge that there was substantial compliance with the requirements of the Ship Mortgage Act and that the invalidation of the mortgages because of these irregularities without any showing of fraud would exalt form over substance. In addition, they contend that no parties have been injured by any deficiencies and that the irregularities amount to no more than harmless error.

The proper execution of a notary's duties of performance is an important obligation and one which should be accorded considerable respect. In order for the credibility and importance of the notary's significant role in commercial transactions to be maintained, the fulfillment of these duties should be rigorously enforced. Despite the gravity of the mortgage parties' disregard for the proper discharge of the notary's duties, however, under these circumstances the failure to swear the parties formally before signing the acknowledgments does not render the acknowledgments or affidavits invalid. While it is true that statutorily required verifications are held to more stringent standards than would otherwise be applied, *Rockwell v. City of Syracuse,*

---

**5.** The parties do not appear to contest the fact that, assuming the mortgages were to be executed in compliance with the formalities attached to the United States preferred ship mortgage, acknowledgments would be necessary despite the fact that § 926, which imposes that requirement, deals with recording and Greek law specifically covers recording.

**6.** The Intervening Plaintiffs also suggest that the notary may have executed some of the notarial jurats before the mortgages were signed. This contention, however, is not supported by the record. At her deposition, the notary indicated only that she had no recollection of many of the events of the execution ceremony.

257 App.Div. 92, 12 N.Y.S.2d 403 (4th Dep't), *aff'd* 282 N.Y. 17, 24 N.E.2d 727 (1939), in this instance each of the signatories appeared before the notaries and was identified to them. The notaries witnessed the execution of the mortgages and signed each acknowledgment.

There is no question as to the identity of any signatory, nor any issue as to any irregularity in the notarizations themselves. There was no proof of fraud or wrongdoing. The purpose of an acknowledgment is to ensure the proper identity of the signing party. Because of the lack of any real issue as to identity, the signing of the acknowledgments by the notaries in the specific circumstances of this case constitutes substantial compliance with the requirements of New York law despite the failure to swear each signatory.

■ As to the date changes in the jurats and mortgages, there is no evidence that the alterations represent anything other than simple negligence or carelessness on the part of Mayer, Brown & Platt, the Plaintiff Banks' attorneys. Although at oral argument the Intervening Plaintiffs suggested that the failure to date the mortgages might give rise to an implication of fraud involving the authority of Pitenis to sign the mortgages, *see* Part II, *infra*, the record does not support such a conclusion. The Intervening Plaintiffs have not demonstrated that they or any other third party have been prejudiced by the informalities in execution. It is true that the Banks should have made every effort to comply with the statutory requirements, given that they were seeking to create and enforce a statutorily created right that gives them a preference not found in traditional maritime lien principles. However, despite the Supreme Court's holding in *Morse Drydock & Repair v. Steamship Northern Star*, 271 U.S. 552, 46 S.Ct. 589, 70 L.Ed. 1082 (1925) in which the Court appeared to require strict compliance with the Act when it held that in order to be valid against third par-

ties a mortgage had to comply with the specific language of § 922(a)(1), (3) as to the endorsement of papers, courts have consistently sustained mortgage instruments upon a showing of good faith efforts to comply with the Act:

> Instruments of this nature should be sustained when there is an honest and substantial compliance with the statutes. A strict construction of the statutory terms should only occur in the face of fraud or, at a minimum, when the complainant can show some injury attributable to the deficiency in the affidavit.

*Lake Jackson State Bank v. O/S Kingfish Too*, 240 F.Supp. 450, 452 (S.D.Tex.1965); *see also, The Merchants Nat'l Bank of Mobile v. Ward Rig*, 634 F.2d 952 (5th Cir.1981); *The Nan B*, 78 F.Supp. 748 (D.Alaska 1948); *Collier Adv. Service Inc. v. Hudson River Day Line*, 14 F.Supp. 335 (S.D.N.Y.1936), *aff'd*, 93 F.2d 457 (2d Cir. 1937).

Although none of the cases cited involve the same informalities in execution as the ones here, the reasoning is followed here. While the informalities relating to the actual creation of a mortgage must be scrutinized carefully, where, as here, no third parties have been prejudiced by the informalities in the formalities, and the mortgage parties have substantially complied with the requirements of execution, holding the mortgages invalid because of these informalities would not only provide an unexpected windfall for third parties but would "defeat[ ] the obvious intentions of the parties without promoting the function of the statute involved." *Clements v. Snider*, 409 F.2d 549, 551 (9th Cir.1969). Despite the improper dating of the notarial jurats, the mortgage parties substantially complied with the requirements of New York law insofar as the execution of the mortgages is concerned, and thus satisfied the requirements for execution of a United States preferred ship mortgage set forth in 46 U.S.C. §§ 921–26.[7]

---

7. The Intervening Plaintiffs contend that because Greek law looks only to the form or status of the mortgage documents at the time of sign-

ing, the application of any United States "curative" legal principles should not affect the validity of execution. However, a finding that the

While it would be comforting to rail at the casual conduct of counsel which created this issue, such an indulgence would in no way reduce the difficulty presented to the court which must determine whether or not to invalidate substantial rights because of the failure to comply with clearly understood formalities in the interest of ease and expedition. The contracting parties intended to create the rights claimed by the Plaintiff Banks, and had the transaction been completed with the appropriate punctilio the Intervening Plaintiffs would have had no recourse but to accept the position of the Plaintiff Banks. The effect of strict enforcement in these circumstances is simply too drastic, given the unwitting nature of the procedural failures, despite the reluctance of this court to condone a performance that is less than what is required. Accordingly, the mortgages were validly signed "in accordance with the form required or permitted by the law of the place of signing" as required by Article 19 of the Ministerial Decrees.

### Recording of Mortgage

Article 19 of the Ministerial Decrees requires that a mortgage be recorded in the appropriate ship registry in Greece in order to be a valid Greek preferred ship mortgage. It is conceded that the mortgages in issue in this case were recorded in the appropriate ship registry at Pireaus. In order to have the mortgages recorded, the mortgage parties brought them to the county clerk in New York who marked them appropriately so that they could be consularized by the Greek consul, an action that appears to be required under Greek law in order to get a mortgage recorded despite some testimony from the banks' witnesses'. The Intervening Plaintiffs, however, contend that because the documents were not properly dated or notarized, they were improperly flagged by the county clerk and therefore improperly consularized, thus making their registration in Greece invalid. Since the notarization and

execution of the documents was in substantial compliance with the requirements and therefore valid as set forth above, the documents were properly accepted under Greek law.

Because the mortgages were validly executed in accordance with the laws of Greece and were properly recorded in Greece, they comply with the requirements of 46 U.S.C. § 951 for the creation of a valid preferred foreign ship mortgage.

### Authority of Hellenic Board to Enter Into Mortgages

In order to establish the existence of a valid mortgage between the Plaintiff Banks and Hellenic, the Banks must establish the authority of those authorizing and executing the mortgage on behalf of the mortgagor. The Intervening Plaintiffs contend that the Banks have failed to establish as a *prima facie* case that the mortgages were validly authorized and executed on behalf of Hellenic because the only evidence presented by the banks is inadmissible hearsay. The Intervening Plaintiffs also contend that, in any event, the testimony presented at trial proves that the Hellenic Board was improperly constituted at the time the mortgages were approved and signed and thus could not validly act to bind the company.

To establish a *prima facie* case that the mortgages were executed by an authorized individual whose authority was conveyed by a properly constituted Board of Directors, the Plaintiff Banks offered into evidence copies of the minutes of six Hellenic shareholder's meetings which took place between February 9, 1982 and August 26, 1982 (Exhibits 20–25), the minutes of thirteen meetings of the Hellenic Board of Directors which took place between March 23, 1982 and May 2, 1983 (Exhibits 28–37, & 60–62), a Hellenic Shareholder's Agreement dated May 31, 1982 (Exhibit 39) and a special power of attorney dated May 2, 1983 authorizing Pitenis to execute the mortgages (Exhibit 2). These documents purport to establish Hellenic's authority to

mortgage parties substantially complied with New York law governing the execution of doc-

uments renders the execution valid at the moment of signing.

enter into the transactions in question. These documents were first introduced and held authentic at an evidentiary hearing before the Special Master in Piraeus, Greece. At trial, the documents were held to be authentic and the Intervening Plaintiffs failed to present any evidence to the contrary.

■ As a preliminary trial ruling, Exhibits 12 and 20–25 were held admissible as public records under Fed.R.Evid. 803(8), to the extent they were not offered to prove the truth of the statements they contain but only that the document was entered into in the case of Exhibit 12, or that the statements in the minutes were made and accurately recorded. Exhibits 28–32a and 60–61 were held admissible as records of regularly conducted business under 803(6), and Exhibits 33–37 were held to be hearsay admissible solely as a basis for Sioufas' expert opinion. Exhibit 39 was also held to be admissible both as evidence of the document signed by the authenticity witness and as a basis for Sioufas' opinion. At the conclusion of trial, the Intervening Plaintiffs renewed their hearsay objections to admission of all of the documents.

As to Exhibits 20–25, the minutes of Hellenic shareholder meetings, an examination of the testimony reveals that they were properly admitted as public records under Fed.R.Evid. 803(8). Fed.R.Evid. 803(8) exempts from the hearsay rule:

> Records, reports, statements, or data compilations in any form, of public offices or agencies, setting forth ... (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report ... unless the sources of information or other circumstances indicate lack of trustworthiness.

At trial Sioufas testified that he obtained these exhibits, which are the minutes of Hellenic shareholder meetings, from the Greek Ministry of Commerce, Prefecture of Attica, Section of Piraeus and that all minutes of the general meetings of shareholders are required to be filed there as a matter of law. The documents therefore qualify as "matters observed pursuant to

duty imposed by law" within the requirements of 803(8). Despite the Intervening Plaintiffs' claim that the lack of any testimony from the preparer or custodian of these documents render them inadmissible, there is no evidence that would support a finding of untrustworthiness. The documents were properly admitted as evidence of what transpired at the meeting, although they are not admissible as evidence of the truth of what was said.

■ Exhibit 12, a certified copy of the special power of attorney No. 4565, dated May 2, 1983, authorizing Pitenis and others to execute the mortgages, was also properly admitted under 803(8). Sioufas testified that he obtained the document from the Greek notary who executed the document and that the exhibit is a notarial document that is required to be kept by the notary under Greek law. The document qualifies as a public record in Greece and is admissible insofar as it is evidence that the document was entered into, not as evidence of the truth of the matter stated therein.

■ Exhibits 28–32 and 60–62, minutes of the Hellenic Board of Directors, were admitted at trial under Fed.R.Evid. 803(6), which exempts:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of regularly conducted business activity, and if it was the regularly practice of that business activity to make the memorandum, report, record, or data compilating, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

At trial, the Banks introduced the deposition testimony of Mr. Anthony Antapasis ("Antapasis"), a former director of Hellenic Lines, in which he identified the exhibits as minutes of meetings of the Hellenic Board of Directors' at which he was present. Antapasis also stated that it was a regular

practice to keep those minutes. The documents thus qualify as business records kept in the course of regularly conducted business activity. In addition, although Antapasis was not the custodian of these records, testimony by a custodian is not a universal requirement of 803(6), *In re Japanese Electronic Products Litigation*, 723 F.2d 238, 288 (3d Cir.1983), and Antapasis' testimony satisfies the requirement of testimony by a "qualified witness." *See* Weinstein's Evidence ¶ 803(b)[.02] at 803–178 ("The phrase 'other qualified witness' should be given the broadest interpretation ...."). Since the Intervening Plaintiffs have failed to establish that the method or circumstances of preparation indicate lack of trustworthiness, Exhibits 28–32 and 60–62 are admitted under Rule 803(6) as evidence of what transpired at the relevant Board of Directors' meetings.

As to Exhibits 32–37, which are also copies of minutes of Board of Directors' meetings, Sioufas testified that he obtained them from the files of the Hellenic trustee, Mr. Vourzidis, and that the trustee certified them as true copies. He further testified that he had previously obtained an order from the Greek Bankruptcy Judge requiring the trustee to deliver to him certified copies of such minutes. Because Sioufas is neither the custodian of these records nor a "qualified witness", these exhibits are not exempted from the hearsay rule by Rule 803(6). Nonetheless, given the testimony of Antapasis as to the business practices of Hellenic in keeping minutes and records and the testimony of Sioufas as to obtaining a court order requiring the trustee in bankruptcy, the successor to the banks and records of Hellenic to turn over certified copies to him, the Banks have established evidence of the trustworthiness of these documents. This conclusion is further supported by a review of these documents against Exhibits 28–33 which were admitted by Antapasis' testimony. The documents qualify for admission under Rule 803(24), which exempts:

A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

The Intervening Plaintiffs object to the admission of these documents under 803(24), citing the notes of the Senate Committee as to the limited scope that should be afforded the exception. While it is true that Rule 803(24) is intended to be used only in unusual situations where the material that would be excluded is important and probative and where there is a sufficiently high degree of trustworthiness and necessity to justify admission, I find that the situation at hand adequately meets these requirements.[8] The minutes of the Board of Directors' meetings are of significant probative value in this case, since they go directly to the technical question of whether the mortgages were validly authorized and executed by Hellenic. Given the similarity of these exhibits to the previously authenticated and admitted minutes and the testimony of Sioufas as to the origin of the documents, there is satisfactory evidence of their inherent trustworthiness.

As to necessity, the Intervening Plaintiffs have correctly pointed out that there were alternate means available by which the Banks could have introduced these exhibits at trial so as to bring them within one of the accepted hearsay exceptions or by which they could have established that the transactions described in the minutes took place. The absence of any Callimanopoulos testimony remains unexplained. However, the Banks did make reasonable efforts to prove properly this evidence as

---

**8.** Even if exhibits 12, 20–25, 28–32, 39 and 60–62 were not admissible under 803(6) and (8), they would also fall within the ambit of 803(24) for the same reasons applicable to exhibits 32–37.

business records within 803(6) through the deposition testimony of another Hellenic director, Mr. Ioannides, who subsequently declined to appear at the depositions in Greece. Given the importance of the exhibits and their inherent trustworthiness, their exclusion as hearsay would be contrary to the general purposes of the rules and the interests of justice. This conclusion is buttressed by the fact that the minutes are not offered for the truth of the matter stated but instead merely aid the Banks in establishing its *prima facie* case, a case which the Intervening Plaintiffs still had an opportunity to rebut.

Finally, Exhibit 39, the shareholders agreement, is properly admissible as a non-hearsay document, to the extent that it is evidence signed by an identifying witness. At the deposition in Greece, Mr. Stylianos Papadimitirou, an attorney representing the interests of all of Pericles Callimanopoulos' heirs except for Gregory Callimanopoulos, testified that exhibit 39 was the text that he signed at the May 31, 1982 meeting of counsel. Although the document is not admissible to prove the truth of the statements contained therein, it is admissible to prove its terms. The document is not an extra-judicial assertion of any fact but is merely evidence of a "verbal act" by the attesting party. *See, e.g., United States v. Bruner*, 657 F.2d 1278, 1284 (D.C.Cir.1981); *Freeman v. Metropolitan Life Ins. Co.*, 468 F.Supp. 1269, 1271 (W.D.Va.1979). It is properly admissible to show the document the parties signed. In any event, as stated at trial, the document is admissible as a basis for Sioufas' opinion. The Intervening Plaintiffs' contention that the transcript of Mr. Papadimitrios is inadmissible because he refused to testify in cross-examination about various matters that he contended were subject to the attorney-client privilege under Greek law is not persuasive. The matters as to which the witness refused to testify went beyond the scope of cross-examination. Furthermore, the document is not admitted to prove its substantive contents but only as proof of what the witness signed.

Because the exhibits called into question by the Intervening Plaintiffs were properly admitted under exceptions to the hearsay rule or as non-hearsay documents, the Banks satisfactorily established as a *prima facie* case that the Hellenic Board of Directors who authorized the creation of the mortgages had been duly elected on June 1, 1982 pursuant to an agreement among the Callimanopoulos heirs dated May 31, 1982. The documents admitted show that there was an agreement entered into by the heirs, that subsequent to that agreement a Board of Directors was elected, and that the Board subsequently then authorized the mortgages. These documents permit the inference that the Board was duly constituted. This conclusion is further supported by Sioufas' testimony as to the Boards' authority.

The Intervening Plaintiffs do not present any evidence that challenges the Banks' contentions as to the substance of various agreements and authorizations or as to the manner in which the Board was elected. Instead, they attempt to challenge the Board's authority on the basis of the testimony of Antapasis at the depositions in Greece that shares of stock on deposit outside of Greece could not validly be voted or counted toward a quorum at shareholders' meetings held in Greece. Antapasis also testified that an amendment of Hellenic's by-laws to permit voting of stock on deposit overseas was invalid, since such amendments violated Greek Laws of Public Order (Ius Cogens). According to Antapasis, during the entire time encompassed by the minutes of shareholder and director's meetings offered into evidence by the Plaintiff Banks, shares were deposited outside of Greece and could therefore not validly be voted. The effect of this testimony, according to the Intervening Plaintiffs was to establish that the shareholder meetings which elected Hellenic's Board of Directors during 1982 and 1983 were nullities since shares of stock on deposit outside of Greece were voted, and that the Board was therefore devoid of authority under Greek law to bind the corporation.

Antapasis' testimony is not sufficient to require the conclusion that the Hellenic Board lacked authority. Antapasis noted that Professor Georapoulos, another expert in Greek law, as well as other authors, have opined that the voting of stock on deposit overseas is legal in accordance with a special law of 1936. Furthermore, at trial Sioufas testified that he investigated and was satisfied as to the legal standing of Hellenic's Board of Directors at the time Pitenis was authorized, although in his opinion letter prepared contemporaneously with the execution of the letters he stated that he "assumed" their authority. More important, Article 16 of the controlling Ministerial Decisions applicable to the Hellenic vessels states as follows:

> The shares certificates of any corporation already established or to be established with respect to the vessel may be freely exported abroad for sale or any other purpose as well as imported into Greece.

Plaintiff Banks' Exhibits 10(a)–10(e), 73, Article 16. The Intervening Plaintiffs have conceded that the applicable Ministerial Decisions have constitutional authority in Greece and supersede inconsistent law. Although the Intervening Plaintiffs contend that there is no testimony on the record as to the applicability or effect of Article 16, the testimony as to the effect of Article 19 in particular and the Ministerial Decrees in general is relevant to this issue and requires this conclusion.

Intervening Plaintiffs have made no other showing of a basis upon which to challenge either the authenticity or reliability of any of the documents demonstrating what votes were taken and what agreements were made. Accordingly, the Plaintiff Banks have established by a preponderance of the evidence that the Hellenic Board was properly constituted and had the authority to enter into the mortgages in issue.

**Insolvency of Hellenic and Voidability of Mortgages as Fraudulent Conveyances**

The Intervening Plaintiffs contend that the Hellenic mortgages should be set aside as void because they were issued by a bankrupt or insolvent debtor and because they qualify as fraudulent conveyances under Greek law. According to the Intervening Plaintiffs, Hellenic's financial position at the time the mortgages were executed and its prospect at that time for future economic recovery are evidence of both Hellenic's insolvency and the Banks' improper motivation. The Plaintiff Banks, on the other hand, contend that at the time the mortgages were granted Hellenic was still solvent and the Banks and Hellenic believed that the refinancing might resolve Hellenic's difficulties, and that the mortgages are not voidable as fraudulent conveyances because Hellenic received good value in exchange for the mortgages.

■ Insolvency under New York is governed by the Uniform Fraudulent Conveyance Act (the "UFCA"), N.Y.Debt. and Cred.Law ¶¶ 270–281, which defines a person as insolvent when "the present fair saleable value of his assets" exceeds the amount required to pay the probable liability on his debts as they mature. UFCA § 271.1. It is the fair saleable value of assets, not their book value, that determines insolvency. *Seligson v. NY Produce Exchange*, 394 F.Supp. 125 (S.D.N.Y.1975). Cash flow is not a factor, and an "inability to pay current obligations as they mature does not show insolvency." *McCarty v. Nostrand Lumber Co.*, 232 A.D. 63, 248 N.Y.S. 606 (2d Dept.1931).

■ Hellenic's December 31, 1982 balance sheet showed a negative $21 million net worth, an amount which took into account a value of $86.3 million for the vessels owned by Hellenic, representing their cost ($129.7 million) less accumulated depreciation ($43.4 million) (Intervening Plaintiffs Ex. 14j). However, appraisals prepared by ship brokers in November and December 1982 reported a market value for the vessels owned by Hellenic of between $127 million and $147 million. As the Plaintiff Banks point out, using these valuations converts Hellenic's December 31, 1982 net worth to a positive figure. Even if the additional $9.5 million negative net

worth reported by Hellenic in June 1983 is taken into account, based on these appraisal figures, I find that Hellenic was not insolvent within the meaning of the UFCA at the time the mortgages were granted.

At trial, Mr. Astras testified that under Greek law a creditor may set aside a mortgage which has been granted by a bankrupt, *i.e.,* a debtor who has stopped paying or is using fraudulent or destructive means to pay. Despite the Intervening Plaintiffs contentions as to Hellenic's status as a bankrupt within the meaning of Greek law at the time the mortgages were granted, the determination by the Greek Bankruptcy Court in judgment No. 259/1984 entered on May 29, 1984 that March 31, 1984, nearly a year after the mortgages were granted, was the date on which Hellenic reached the point of "permanent stoppage of its payments" or became bankrupt is dispositive of the issue under Greek law. Although Patkos testified at trial that this is not a final determination and that the Intervening Plaintiffs have filed a petition in Greek Bankruptcy Court on April 29, 1985 seeking to have the aforesaid judgment modified, there is no indication at this time that the Greek Bankruptcy Court will upset this determination. As Judge Sear noted in *Morgan v. M/V Grigorious C.IV, supra,* the possibility of such a redetermination is at this time purely speculative.

As to the other claims raised by the Intervening Plaintiffs, whether or not the granting of the mortgages represented the creation of a "destructive or fraudulent" means of payment or a fraudulent conveyance under either Greek or New York law depends on the characterization given the $80 million Revolving Credit Facility. Based on the evidence presented, the granting of the mortgages was intended to benefit Hellenic as well as to improve the Bank's secured position.

As proof of its contentions that the Hellenic mortgages were issued only to provide the Bank with additional security, the Intervening Plaintiffs point to the fact that even though the Banks decided in December 1982 when they rejected Hellenic's first refinancing suggestion that approximately $21 million in funding was required over 1982 and 1983 in order to get Hellenic through its financial difficulties, the final package arrived at in May 1983 only covered approximately $10 million of this $21 million estimate. According to the Intervening Plaintiffs, the Banks were fully aware of Hellenic's financial crisis, in particular because Hellenic was unable to meet its payments on its loans to the Banks in February and March of 1983, and took the mortgages with the knowledge that they were likely to further impede Hellenic's financial position. The Intervening Plaintiffs contend that Hellenic was not generating sufficient operating revenue to cover its costs, much less any interest payments on outstanding debt, and that the $80 million facility was an attempt to restructure Hellenic's debt with the sole purpose of improving the Banks, rather than Hellenic's, position.

The testimony at trial failed to establish that the refinancing was intended as a means to benefit unfairly the Banks. Ms. Judith Plows ("Plows"), a vice-president and a bank officer at Morgan directly concerned with Hellenic, testified that the restructuring was intended to enable Hellenic to weather adverse economic conditions brought about by a worldwide recession, especially in shipping, and drop in oil prices so that Hellenic could continue its modernization effort and be in a position to operate more profitably when the market improved. Although it appears from Plows and Ms. Ammons' testimony that Morgan was fully aware of the extent of Hellenic's financial difficulties during the relevant time period and that Hellenic had been in very severe financial straits for an extended period of time, the situation as it appeared to the Banks was not such that it would have been impossible for Hellenic to overcome its difficulties. It is conceivable that given an infusion of cash and the right combination of circumstances, Hellenic might have been able to gain sufficient short term stability so as to develop a more

far-reaching recovery plan. This is only speculation and not proof to the contrary.

The Banks' decision to go forward with a refinancing that did not directly provide $21 million in cash, the amount they had previously decided was necessary, is not convincing evidence of bad faith. Plows testified that in addition to the $10 million in new funds provided by the refinancing, Hellenic also benefited from the release of $7 million in marketable securities and, equally important, by the moratorium on principal payments granted by the Banks, payments that would have amounted to $32 million for 1983 and 1984. Although the Intervening Plaintiffs contend that the moratorium served to increase the eventual interest payments and that the release of the securities did not actually give Hellenic additional cash, the moratorium and the release did improve Hellenic's short term financial position. In addition, Plows stated that Morgan believed there were other sources of additional funds available to Hellenic, including the sale of vessels and capital from Hellenic's principals.

Although the testimony at trial revealed that Morgan did not anticipate the realization of any substantial sum from the sale of unencumbered vessels, and that despite the Banks' expectations Callimanopoulos had consistently refused to inject additional capital, the existence of these possible sources, when coupled with the substantial benefits that accrued to Hellenic because of the restructuring and the possibility that the world-wide economic situation might change in a beneficial manner, leads to the conclusion that the Banks might reasonably have expected that the restructuring would enable Hellenic to survive its financial crisis.

Furthermore, it does not appear that the Plaintiff Banks reduced their credit exposure to the extent asserted by the Intervening Plaintiffs. According to Plows' testimony, Morgan's credit exposure was reduced from $44.1 million, of which $4 million was unsecured, to $40 million, all of which was secured by mortgages on the vessels. Continental's credit exposure increased from $25.75 million, of which $3.6 million was previously unsecured, to $30 million, all of which was secured by the mortgages. In addition, the Banks essentially released $7 million of previously pledged marketable securities, their most liquid collateral, and stretched out the risk of non-repayment for two additional years. The four previously unencumbered vessels which were mortgaged for the $80 million Revolving Credit Facility were appraised at approximately $14 million. Plows testified that the whole transaction was consistent with established collateral requirements followed by banks engaged in ship financing, i.e., 140% of the loan amount. Even though the effect of the refinancing was to allow the Banks to convert unsecured debt to secured debt, the refinancing also increased their overall risk.

In addition, the refinancing may have actually improved the position of other creditors, rather than depriving them of their rights, depending upon the payments received during the period of the refinancing. In any event, even if the refinancing improved the Banks' positions relative to Hellenic's other creditors, the Intervening Plaintiffs have failed to establish that the refinancing represented the creation of a "destructive or fraudulent" means of payment or a fraudulent conveyance because Hellenic received full consideration for the mortgages. The UFCA permits a creditor to receive payment of an antecedent debt because the debtor has received compensating value from the creditor. See N.Y. Debtor and Cred.Law § 273. In this case, the mortgages, which were given in exchange for both antecedent and new debt, were taken in good faith by the Banks as part of an effort to resolve Hellenic's financial difficulties and not solely as a means by which the Banks could improve their position or deprive other creditors of their rights. The mortgages may not be set aside under either Greek or New York law.[9]

9. Because of this conclusion, there is no need to reach the issue of actual notice.

## The HELLENIC SPIRIT

To the extent that the Intervening Plaintiffs attack the validity of the mortgage on the HELLENIC SPIRIT on the grounds of improper execution of the mortgage and failure to establish the authority, the reasoning above is equally applicable. The Intervening Plaintiffs have failed to show that the mortgage should be invalidated because of any informalities of execution, and the Banks have successfully established that the Transpacific Board of Directors was properly constituted and had the authority to enter into the mortgage.

■ The Intervening Plaintiffs also attack the SPIRIT mortgage on the grounds that it is void as a fraudulent conveyance or as payment by an insolvent, or as a voidable preference under Federal Bankruptcy Law. According to the Intervening Plaintiffs, the SPIRIT mortgage presents an even stronger case for being set aside because it was granted at a time considerably closer to the point of Hellenic's collapse. Plows testified that as of June of 1983 Morgan believed that Hellenic had defaulted on the covenant in the $80 million facility that required Hellenic to have a minimum net worth of $50 million. They point to the fact that the sale of the SPIRIT took place at the peak of Hellenic's cash crisis and at a time when the Bank had been trying to convince Hellenic to sell off some vessels. According to the Intervening Plaintiffs, the effect of the mortgage was to siphon off millions of needed cash that would have been used to pay trade debts into an unnecessary ship. Plows testified that although the sale of the SPIRIT was contracted for in February of 1983, the transaction would not have gone through if Morgan and SFE had refused to guarantee the loan. The Intervening Plaintiffs contend that Hellenic invested over $2 million which would otherwise have been used to pay trade creditors, to purchase an asset which would revert to Morgan and SFE

upon any event of default either in the SPIRIT or in the $80 million transactions.

The Intervening Plaintiffs have not established that the SPIRIT mortgage represents a fraudulent conveyance or an attempt to defraud other creditors. Although Hellenic was in a worse financial position at the time the Banks guaranteed the SPIRIT transaction, it had not yet degenerated to the point of insolvency.[10] Furthermore, the mortgage was given in exchange for full consideration. A guarantee of indebtedness or a promise to secure future advances may qualify as fair consideration or "reasonably equivalent value" for a mortgage. *See generally Southland Financial Corporation v. Oil Screw Mary Evelyn,* 248 F.Supp. 520 (E.D.La.1965); *W.L. Development Corp. v. Trifort Realty,* 44 N.Y.2d 489, 487, 406 N.Y.S.2d 437, 377 N.E.2d 969 (Ct.App.1978); *Shay v. Gagne,* 275 Mass. 386, 176 N.E. 200, 201 (1931). Because in this case the Banks were required to guarantee, and later to cover, a significant loan in exchange for the mortgage, the mortgage was granted in exchange for fair consideration or equivalent value within the meaning of the UFCA, N.Y. Debtor and creditor Law §§ 273–275, as well as § 548 of the Bankruptcy Code.

In addition, the mortgage was not given with the intent to improve the Bank's position to the detriment of Hellenic and other creditors. There was no cross-collateralization between the two mortgage transactions, and the SPIRIT mortgage did not affect the Banks' position with respect to the earlier transactions. As noted above, the Banks gave full consideration for the mortgage.

As to the effect of the purchase of Hellenic's finances, even though Morgan and SFE could have prevented the sale from going through, there is no indication that they were in any way the impetus for the transaction. Furthermore, the Intervening Plaintiffs have not shown that the Banks could not reasonably have anticipated a

---

**10.** This conclusion defeats the Intervening Plaintiffs' argument that the SPIRIT mortgage should be invalidated because Transpacific was insolvent at the time the mortgage was given, since this argument depends on a preliminary finding of Hellenic's insolvency.

beneficial effect on Hellenic's position from the purchase. The mortgage was not taken in bad faith or with the intent to defraud required by N.Y.Debtor and Cred.Law § 276.

The Intervening Plaintiffs also contend that the transaction constitutes a voidable preference within 11 U.S.C. § 547. However, even if they had standing to assert that the granting of the SPIRIT mortgage constituted a preference, *see Lake Union Drydock Co. v. M/V POLAR VIKING*, 446 F.Supp. 1286, 1294 (W.D.Wash. 1978) (standing under 11 U.S.C. § 547 limited to trustee in bankruptcy), they have failed to establish that the mortgage was granted on account of an antecedent debt or that the transfer took place within the preference period. *See* 11 U.S.C. § 547(b)(2) and (4)(A). The *SPIRIT* mortgage therefore is a valid and enforceable preferred foreign ship mortgage within § 951.

**Motion for Costs**

The Plaintiff Banks' request for costs for the depositions in Greece are denied. The Plaintiff Banks initiated the Greek depositions, and the depositions helped establish the validity of the mortgages.

For the reasons discussed above, I find that the mortgages at issue qualify as valid foreign preferred ship mortgages under 46 U.S.C. § 951, and they are entitled to the maritime lien priority accorded that classification.

Any remaining issues as to priorities or the amount of any particular claims have already been referred to the Special Master who will report and recommend as soon as practicable.

IT IS SO ORDERED.