**In re CENTENNIAL TEXTILES, INC., and Dynasty Prints, Inc., Debtors.**

**Hal M. HIRSCH, as Trustee of the estates of Centennial Textiles, Inc., and Dynasty Prints, Inc., Plaintiff,**

v.

**Barry GERSTEN, Skyel Enterprises, Inc., Herbert Crohn and MBL Life Insurance Company, Defendants.**

Bankruptcy Nos. 96 B 46472 (BRL), 96 B 46473 (BRL). Adversary No. 97–9122A.

United States Bankruptcy Court, S.D. New York.

Feb. 19, 1998.

Gainsburgh & Hirsch, L.L.P., by David L. Barrack, New York City, for Trustee.

Ross & Hardies, by Helen Davis Chaitman, New York City, for Barry Cersten.

## MEMORANDUM DECISION GRANTING TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

BURTON R. LIFLAND, Bankruptcy Judge.

Before me is the motion of Hal M. Hirsch (the "Trustee"), as Trustee of the estates of debtors Centennial Textiles, Inc. ("Centennial") and Dynasty Prints, Inc. ("Dynasty", and together with Centennial, the "Debtors"), the Plaintiff in this adversary proceeding, for summary judgment on two of the 36 causes of action set forth in the Amended Complaint. In essence, the fifteenth cause of action alleges the fraudulent conveyance of certain life insurance policies to defendant Harry Gersten ("Mr. Gersten") by Centennial and of certain post-conveyance insurance premiums paid by Centennial with respect thereto. The eighteenth cause of action seeks turnover of those policies by the insur-

er, MBL Life Insurance Company ("MBL"), the stakeholder of the policies. MBL has neither answered the complaint nor responded to this motion.

### Background

On November 27, 1996, the Debtors, which had been engaged in the business of converting greige (unfinished) textile goods into finished goods for sale to clothing and other apparel manufacturers, filed voluntary petitions under Chapter 11 of the Bankruptcy Code (the "Code"), 11 U.S.C. §§ 1101–1146. However, the Debtors' Chapter 11 cases were subsequently converted to cases under Chapter 7 of the Code and the Trustee was appointed initially interim and then permanent trustee. The Trustee's investigations revealed that on or about December 23, 1981, Centennial purchased from MBL insurance policy no. 7,050,385, with a face amount of $1,000,000, on the life of Mr. Gersten, who was at all material times the president and a director and shareholder of Centennial. Centennial was named as the owner and beneficiary. On February 3, 1982, Centennial purchased a second insurance policy no. 7,057,489 from MBL, again on the life of Mr. Gersten with Centennial the named owner and beneficiary. This policy had a face amount of $500,000. On about November 7, 1995, Mr. Gersten, as president of Centennial, completed and submitted a policy change service request to change ownership of policy nos. 7,050,385 and 7,057,489 (the "Policies") to "the insured," i.e. Mr. Gersten personally. The effect of such request was also to make Mr. Gersten beneficiary of the Policies. On April 1, 1996, Centennial made payments totaling $24,586.65 (the "Premium Payment") to MBL on account of the monthly premiums for the Policies. According to letters from MBL to Mr. Gersten respectively dated July 23, 1996, as of May 31, 1996, policy no. 7,050,385 had a current gross cash value of $202,597.21 and policy no. 7,057,489 had a current gross cash value of $104,745.27.

The Trustee alleges that at the time of the transfer of the Policies to Mr. Gersten and at the time of the Premium Payments, Centennial was insolvent and that no consideration was received by Centennial therefor. Evidence in support of these contentions is provided in the affidavit of Andrew W. Plotzker, a certified public accountant of the firm of BDO Seidman, LLP ("BDO"), the accountants retained by the Creditors' Committee during the Chapter 11 administrative period and subsequently by the Trustee. Mr. Plotzker states that BDO has reviewed the books and records of Centennial as well as audited, unaudited and draft financial statements (the "Statements") prepared by Ernst & Young, LLP ("E&Y"), Centennial's prepetition accountants, and their work papers, and that such records and related financial information reveals that, at least since May 31, 1995, Centennial was insolvent. Based upon the Debtors' financial statement for the fiscal year ended May 31, 1995 (the "1995 Statement"), audited by E&Y, the Debtors' had combined assets of $23,075,967.00 and liabilities of $24,463,374.00. Based upon a financial statement prepared by E&Y for the nine months ending February 29, 1996 (the "February 1996 Statement"), the Debtors had combined assets of $22,781,005.00 and liabilities of $24,840,789.00. Based upon a draft of the Debtors' financial statement for the fiscal year ended May 31, 1996 (the "May 1996 Statement"), prepared by E&Y, the Debtors had combined assets of $14,372,417.00 and liabilities of $20,595,651.00. Because Centennial guaranteed all of Dynasty's debt to the Debtors' trade factors, all of Dynasty's liabilities, save approximately $200,000 in non-factor trade debt, are Centennial's liabilities. Mr. Plotzker further states that BDO could not locate in the documents and records it reviewed evidence of the receipt by Centennial of any consideration for the transfer of the Policies or for the Premium Payments.

The Trustee alleges that prior to, as of the date, and after the transfer of the Policies and the Premium Payments, Republic Factors Corp. ("Republic") held an unsecured claim against Centennial and that as of the petition date, Republic held such claim as an unsecured claim allowable under § 502 of the Code. In addition, Gaines Motor Lines, Inc., District 65 Pension Plan, American Credit Indemnity, Jay Peters, Inc., Mastex Industries, Inc. and H & S, Inc. have all filed claims, to which no objection has been made and which are allowable under § 502 of the

Code, that accrued prior to the date of the transfer of the Policies.

Mr. Gersten resists summary judgment, identifying, *inter alia,* two contested facts which facts are fundamental to the Trustee's case, namely (i) that Centennial did not receive fair consideration for the transfer of the Policies or the Premium Payments, and (ii) that as of November 7, 1995 and April 1, 1996, Centennial was insolvent. He has submitted his own affidavits as well as two affidavits of David Bernstein, a member of the accounting firm of David Bernstein & Co., which served as independent auditors from the Debtors' inception until 1989 and thereafter until the commencement of this case as inside accountants.

With regard to the fair consideration issue, Gersten claims that the transfer of the Policies was made as partial compensation to him for in excess of $8,521,000 which he personally pledged, contributed or assumed liability for in the two years preceding the filing, for the benefit of Centennial and its creditors. Specifically, he alleges that the Policies were transferred to him as part of the consideration for his funding the March 1995 buy-out (the "Buy-out") by him of the 63% stock interest of Merrill Lynch Interfunding, Inc. ("MLIF") in Centennial. As part of the Buy-out, he says, he personally guaranteed Republic's $5 million loan to Centennial and secured his guaranty with $3.5 million of U.S. Treasury Notes. He also paid MLIF $1,750,000 in cash. As a result, Centennial was forgiven more than $12 million of debt to MLIF. In addition, Mr. Gersten makes ref-erence to certain payments totaling $721,000 he made to Centennial in September 1996 and to his payment of $300,000 to Montreal Dyers on behalf of Centennial that month. However, Mr. Gersten does not appear to argue that such payments were made in consideration of the transfer of the Policies, which preceded the payments by some 10 months, or the Premium Payments, which preceded the payments by some 5 months.

The Premium Payments, Mr. Gersten says, were part of his 1996 compensation. In support of this claim, Mr. Gersten points to the fact that Centennial issued a Form 1099 in respect of the Premium Payments and Mr. Gersten paid taxes thereon as part of his income. Mr. Gersten also points to the fact that two weeks before the Premium Payments, he had personally guaranteed $750,-000 of the subordinated $1.5 million loan by Herbert Cron (sued herein as "Herbert Crohn"), the executive vice president of and a shareholder in Centennial, to Centennial. Finally, in September 1996, Mr. Gersten voluntarily advanced approximately $1 million to or for the benefit of Centennial.

With regard to the second disputed fact, Centennial's solvency at the material times, Mr. Gersten disputes the fair saleable value of Centennial's inventory used by the Trustee in his calculations and argues that certain debts reflected on the Statements should be excluded from Centennial's liabilities for purposes of the calculations. The following table (the "Table") summarizes the adjustments that Mr. Gersten argues should be made to the Trustee's calculations regarding solvency:

|  | 5/31/96 | 2/29/96 | 5/31/96 |
|---|---|---|---|
| Deficit claimed by Trustee | (1,387,407) | (2,059,784) | (6,233,234) |
| Inventory adjustment | 2,724,750 | 2,691,000 | 1,706,290 |
| Adjustment in trade liabilities | 650,000 | 650,000 | 650,000 |
| Elimination of long term Republic debt | 4,218,750 | 4,218,750 | 4,218,750 |
| Elimination of Gersten subordinated debt | 1,750,000 | 1,750,000 | 1,750,000 |
| Elimination of Cron subordinated debt |  |  | 1,500,000 |
| Alleged solvency | 7,956,093 | 7,249,966 | 3,601,806 |

With regard to inventory, Mr. Gersten disputes that book value or cost represents the fair saleable value. He claims that "most of the debtors' inventory was sold for 15% above cost." The 1995 Statement shows that

the Debtors had inventory at cost of $18,165,000 yet, it is alleged, the fair saleable value was 115% of this amount, or $20,889,750, a differential of $2,724,750, by itself wiping out the deficit claimed by the Trustee. Applying the same calculation to the Debtors' inventory at cost of $17,940,000 at the end of February 1996, a differential of $2,691,000 again is alleged to wipe out the deficit alleged by the Trustee. The figures for the end of May 1996, as represented in the Table, although not wiping out the alleged deficit, reduce it by $1,706,290.

In reply, the Trustee disputes Mr. Gersten's valuation of inventory at 15% above cost. He points out that according to the 1995 Statement, Centennial sold goods at 3.16% below cost after deducting the cost of goods sold, selling and shipping expenses, general and administrative expenses, interest, factor interest and finance charges. The February 1996 Statement showed sales at 1.96% below cost and the May 1996 Statement showed sales at 7.6% below cost.

With respect to liabilities, Mr. Gersten argues that not all existing debts should be included in the analysis. First of all, two of Centennial's liabilities allegedly existing from May 31, 1995 through May 31, 1996 were disputed and, in fact, substantially reduced when satisfied. A disputed debt due Montreal Dyers in the sum of $700,000 was settled for $300,000 in September 1996. Another disputed debt owed to Columbia Dying & Finishing was ultimately discounted by $250,000.

Secondly, of $4,843,750 owed to Republic in May 1995, only $625,000 was a current liability due within one year. The balance should not, Mr. Gersten argues, be included in the calculation of (in)solvency. Further, Mr. Gersten argues, since the Republic loan was secured by a $3.5 million pledge (the "Pledge") of U.S. treasury obligations, a deduction should be made to Centennial's liabilities in this sum. In addition, the $1,750,000 subordinated note due Mr. Gersten should be excluded because Mr. Gersten "did not intend to enforce this debt so long as Centennial owed money to other creditors." The first payment due under the note was due on July 1, 1996. However, Mr. Gersten deferred the

payments due through 1996 and, as of about March 1996, deferred the due date through July 1, 2001. Finally, the $1.5 million subordinated debt to Mr. Cron shown in the May 1996 Statement should be excluded because it is not due until July 1, 2001. Moreover, Mr. Gersten personally guaranteed $750,000 thereof (and, in fact, has paid thereon).

### *Discussion*

### Summary Judgment

Federal Rule of Civil Procedure 56(c), made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7056, provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir.1994). Summary judgment is appropriate if, in light of the evidence presented, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). On a summary judgment motion, the moving party has the burden of demonstrating the absence of any genuine issue of material fact, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11, 91 L.Ed.2d 202 (1986); *United States v. Certain Funds on Deposit in Scudder Tax Free Inv. Account No. 2505103*, 998 F.2d 129, 131 (2d Cir.1993); *Thomson McKinnon Securities Inc. v. Leasure (In re Thomson McKinnon Securities Inc.)*, 132 B.R. 9, 11 (Bankr.S.D.N.Y.1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). Once the movant has made its showing, the burden of production shifts to the non-movant who must "go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and

admissions on file, establish that there is a specific and genuine issue of material fact warranting a trial." *See Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (*quoting* FED. R.CIV.P. 56(c)). The non-movant cannot cast some metaphysical doubt on the moving party's assertions. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The non-movant must present specific significant probative evidence supporting its case sufficient "to require a judge to resolve the parties' differing versions of the truth at trial." *In re Calstar, Inc.,* 159 B.R. 247, 251 (Bankr.D.Minn.) (*quoting Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510–11). There is no genuine issue for trial if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356. The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the non-moving party's case. *Gallo,* 22 F.3d at 1223–24.

■ Although Mr. Gersten's Memorandum of Law complains that summary judgment is inappropriate here because there has been no discovery, he has submitted no Rule 56(f) affidavit. A reference to the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for a Rule 56(f) affidavit and the failure to file an affidavit under Rule 56(f) is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate. *See Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137 (2d Cir.1994).

**Fraudulent Conveyances**

The trustee relies on §§ 270–73 and 278 of the New York Debtor and Creditor Law (the "DCL") and §§ 544 and 550 of the Code. Under § 550(a)(1) of the Code, a trustee may recover from an initial transferee the property whose transfer was successfully avoided pursuant to, *inter alia,* § 544 of the Code, alternatively, if the court so orders, the value of such property. *See Pereira v. Goldberger (In re Stephen Douglas, Ltd.),* 174 B.R. 16, 19 (Bankr.E.D.N.Y.1994). Section 544(b) of the Code enables the trustee, as representative of creditors, to avoid any transfers of property that are voidable under state law by a creditor who has an allowable unsecured claim. *See id.* Section 544(b), however, contains no original substantive provisions to determine when a transfer is voidable; instead it incorporates and makes applicable nonbankruptcy law.[1] *See id.* at 19–20. The applicable nonbankruptcy law upon which the Trustee relies is contained in the Uniform Fraudulent Conveyance Act ("UFCA") as adopted by the State of New York in DCL Article 10, specifically § 273, the constructive fraudulent conveyance provision. DCL § 273 denominates as fraudulent those conveyances made by an insolvent for inadequate consideration, without regard to actual intent.[2] *See id.* Both insolvency and a lack of fair consideration are prerequisite to a finding of constructive fraud under § 273. *See id.*

■ The burden of proving insolvency and the lack of fair consideration is generally upon the party challenging the conveyance. *See MFS/Sun Life Trust–High Yield Series v. Van Dusen Airport Services Co.,* 910 F.Supp. 913, 936–37 (S.D.N.Y.1995); *In re Stephen Douglas, Ltd.,* 174 B.R. at 19; *American Inv. Bank, N.A. v. Marine Midland Bank, N.A.,* 191 A.D.2d 690, 595 N.Y.S.2d 537, 538 (2d Dep't 1993); *Rego Crescent Corp. v. Tymon (In re Rego Crescent Corp.),* 23 B.R. 958, 968 (Bankr. E.D.N.Y.1982). However, where the evidentiary facts as to the nature and value of the consideration are within the transferee's control, as is the case here, the burden of com-

---

1. Insofar as here applicable, 11 U.S.C. § 544(b) reads as follows:

   The trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim allowable under section 502 of this title ...

2. Section 273, in relevant part, provides as follows:

   Every conveyance made ... by a person who is ... insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made ... without a fair consideration. N.Y.Debt & Cred.Law § 273 (McKinney 1990).

ing forward with the evidence of the fairness of the consideration shifts to the transferee. *See ACLI Government Securities, Inc. v. Rhoades,* 653 F.Supp. 1388, 1391 (S.D.N.Y. 1987), *aff'd,* 842 F.2d 1287 (2d Cir.1988); *see also Gray v. Fill (In re Fill),* 82 B.R. 200 (Bankr.S.D.N.Y.1987).

### Fair Consideration

DCL § 272 provides, in relevant part:

Fair consideration is given for property, or obligation,

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied ...

N.Y.Debt. & Cred.Law § 273 (McKinney 1990).

Mr. Gersten's explanation of the consideration for the transfer of the Policies as the satisfaction of an antecedent debt which arose in connection with the Buy-out must be viewed with the utmost skepticism given the lack of contemporaneity and apparent absence of any documentary evidence linking such transfer with the Buy-out. Fundamentally, Mr. Gersten has failed to explain how his actions in relation to the Buy-out resulted in the creation of an "antecedent debt" owed him by Centennial. Similarly, Mr. Gersten has failed to establish or even argue any relevant link between the transfer of the Policies and the payments he made to and on behalf of Centennial in September 1996. Although Mr. Gersten's explanation with respect to consideration for the Premium Payments is on its face more plausible, it too must be viewed with a good deal of skepticism given that the only evidence Mr. Gersten has provided in support is a copy of a Form 1099. Such a dividend was not reflected in the May 1996 Statement.

■ In any event, under New York law, transfers from an insolvent corporation to an officer, director or major shareholder of that corporation are per se violative of the good faith requirement of DCL § 272 and the fact that the transfer may have been made for a fair equivalent is irrelevant. *See Allen Morris Commercial Real Estate Services Co. v. Numistatic Collectors Guild, Inc.,* 1993 WL 183771, at *9 (S.D.N.Y. May 27, 1993). *See also Atlanta Shipping Corp. v. Chemical Bank,* 818 F.2d 240, 249 (2d Cir.1987) ("... repayment of an antecedent debt constitutes fair consideration unless the transferee is an officer, director, or major shareholder of the transferor."); *In re Checkmate Stereo and Electronics, Ltd.,* 9 B.R. 585, 617 (Bankr. E.D.N.Y.1981), *aff'd,* 21 B.R. 402 (E.D.N.Y. 1982) ("Good faith may be lacking because of a transferee's knowledge of a transferor's unfavorable financial condition at the time of the transfer, ... or because of a transferee's position as an insider with control over the corporation's finances."). Since Mr. Gersten was at the relevant times at least both a director and major shareholder in Centennial, as a matter of law, I find that the transfer of the policies and the Premium Payments were not made in good faith and Mr. Gersten cannot resist summary judgment unless he raises a triable issue as to Centennial's solvency at the relevant dates and, accordingly, to that issue I now turn.

### Insolvency

DCL § 271 provides:

A person is insolvent when the present fair saleable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

N.Y.Debt. & Cred.Law § 273 (McKinney 1990). Unfortunately, there is no accepted test for determining insolvency under the DCL. *In re Best Products Co., Inc.,* 168 B.R. 35, 53 (Bankr.S.D.N.Y.1994), *appeal dismissed,* 177 B.R. 791 (S.D.N.Y.1995), *aff'd,* 68 F.3d 26 (2d Cir.1995). Courts have not been uniform in construing the meaning of insolvency for purposes of § 2 of the UFCA (enacted in New York as DCL § 273). *See Murphy v. Meritor Savings Bank (In re O'Day Corp.),* 126 B.R. 370, 397 (Bankr. D.Mass.1991); Cieri, Heiman, Henze, Jenks, Kirschner, Riley and Sullivan, *An Introduction to Legal and Practical Considerations in the Restructuring of Trouble Leveraged Buyouts,* 45 Bus.Law. 333, 359 (1989) [hereinafter Cieri]; Queenan, *"The Collapsed Leveraged Buyout and the Trustee in Bankruptcy,"* 11 Cardozo L.Rev. 1, 14 (1989). In

some cases an "equity" or cash-flow test of insolvency—debtor is unable to pay debts as they become due—has been applied and in other cases a "balance-sheet" test of insolvency—debtor's entire property and assets are insufficient to pay its debts—has been applied. *See* Cieri, at 359. *See also* Selassie, *Valuation Issues in Applying Fraudulent Transfer Law to Leveraged Buyouts,* 32 B.C.L.Rev. 377, 386 (1991). Yet a third test, a blending of these two, appears to have been employed by the Pennsylvania courts. *See In re O'Day Corp.,* 126 B.R. at 397. In *Larrimer v. Feeney,* 411 Pa. 604, 192 A.2d 351 (1963), the Supreme Court of Pennsylvania construed Pennsylvania's enactment of UFCA § 2 thus:

> A reasonable construction of the foregoing statutory definition of insolvency indicates that it not only encompasses insolvency in the bankruptcy sense i.e. a deficit net worth, but also includes a condition wherein a debtor has insufficient presently salable assets to pay existing debts as they mature. If a debtor has a deficit net worth, then the present salable value of his assets must be less than the amount required to pay the liability on his debts as they mature. A debtor may have substantial paper net worth including assets which have a small salable value, but which if held to a subsequent date could have a much higher salable value. Nevertheless, if the present salable value of assets are [sic] less than the amount required to pay existing debts as they mature the debtor is insolvent.

*Larrimer v. Feeney,* 411 Pa. at 608, 192 A.2d at 353 (1963) (citation omitted). Citing *Larrimer,* the District Court stated:

> Pennsylvania state courts and federal courts have consistently taken the position that the test of solvency under the Act is the present ability to pay one's debts as they mature, ... and a debtor will not be considered solvent under the Act merely because he is still able to trade on credit or has assets with a fair market value which would permit him to pay his debts at some future time upon a liquidation of his business.

*United States v. Gleneagles Inv. Co.,* 565 F.Supp. 556, 578 (M.D.Pa.1983) (citations omitted), *aff'd sub nom. United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3d Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). These courts effectively concluded that the UFCA contemplated "present" liquidation whereas the Bankruptcy Code envisioned subsequent liquidation. This has been construed as encompassing insolvency in the equity sense:

> Pennsylvania courts have held that this solvency definition contains two components. First, in the bankruptcy sense, a transferor may be insolvent if it has "a deficit net worth." ... Second, insolvency "in the equity sense" means "the liability to meet obligations as they mature."

*Moody v. Security Pacific Business Credit, Inc.,* 127 B.R. 958, 994 (W.D.Pa.1991), *aff'd,* 971 F.2d 1056 (3d Cir.1992) (citations omitted).

■ Nevertheless, the courts in New York have not, for the most part, drawn any distinction between the UFCA and the Bankruptcy Code's test of insolvency. The District Court, Southern District of New York, has stated that the standard to be applied under DCL § 271 is "insolvency in the 'bankruptcy' sense." *See United States v. 58th St. Plaza Theatre, Inc.,* 287 F.Supp. 475, 497 (S.D.N.Y.1968). The court went on to contrast the bankruptcy test of insolvency with the equity test of insolvency:

> The equity test of insolvency equates insolvency with a lack of liquid funds, or the inability to pay one's debts in the ordinary course of business as the debts mature. This test normally has the lower threshold of compliance; it may be met by companies in temporary financial difficulty which are not on the verge of failure. The bankruptcy test of insolvency, on the other hand, focuses on the balance sheet of a company at discreet intervals of time in order to determine whether the company's liabilities exceed its assets; it will typically be met by companies in serious financial difficulty.

*United States v. 58th St. Plaza Theatre, Inc.,* 287 F.Supp. at 500 (quoting *Kreps v. C.I.R.,* 351 F.2d 1, 9). The test has been equated to

that under § 1(19) of the Bankruptcy Act *Seligson v. New York Produce Exchange,* 394 F.Supp. 125, 129 (S.D.N.Y.1975), and that under § 101(26) of the Code,[3] *Pirrone v. Toboroff (In re Vaniman Int'l, Inc.),* 22 B.R. 166, 185 (Bankr.E.D.N.Y.1982). The test is otherwise known as the "balance sheet" test. *See Briden v. Foley,* 776 F.2d 379, 382 (1st Cir.1985); *Barber v. First Midwest Bank/Western Illinois, N.A. (In re Oneida Grain Co.),* 202 B.R. 606, 608–609 (Bankr. C.D.Ill.1996). However, what is abundantly clear is that while some courts may not deem balance sheet insolvency a necessary condition for insolvency under UFCA § 2, all courts deem it sufficient. Thus, Mr. Bernstein's insistence that Centennial "was paying its debts as they became absolute and matured as of November 7, 1995 and as of April 1, 1996" does not further Mr. Gersten's contention that Centennial was solvent under DCL § 273 at the material times.

### Trade Liabilities

With regard to Mr. Gersten's claim that Centennial's trade liabilities should be reduced by $650,000, I am satisfied that at trial Mr. Gersten might be able to show that the probable liability on the Montreal Dyers and Columbia Dying & Finishing debts as at the relevant dates was substantially less than that reflected in the financials notwithstanding the absence of any note therein to that effect.

### Republic Debt Long Term

■ On the other hand, I find wholly unconvincing Mr. Gersten's argument that only Centennial's current debt to Republic, and not its long term debt, should be included in the calculation of insolvency under DCL § 271(1). A debt "includes any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." N.Y.Debt. & Cred.Law § 270 (McKinney 1990). Thus, debts need not be absolute or matured to be considered in evaluating a corporation's insolvency. *See Allen Morris Commercial Real Estate Services Co. v. Numistatic Collectors Guild, Inc.,* 1993 WL 183771, at *8. Thus, for example, in *Vaniman,* the debtor's liability under a mortgage

securing, inter alia, the payment by a third party of $125,000 due in monthly installments over 7 years was a liability to be included in the calculation of insolvency under DCL § 271. *Pirrone v. Toboroff (In re Vaniman Int'l, Inc.),* 22 B.R. at 185. It is true that *Elliott v. Elliott,* 365 F.Supp. 450, 454 (S.D.N.Y.1973), which is relied on by Mr. Gersten, states that the outstanding debt of a periodic mortgage is not included in the insolvency calculation. This statement, however, is without analysis or support and is not persuasive.

### Republic Debt: Effect of Pledge

■ Mr. Gersten's argument that Republic's debt should be reduced by the amount of the Pledge also fails. Centennial's liability to Republic was absolute. Indeed, even if Republic resorted to this security, Centennial's liability would not be expunged but rather replaced by an identical liability to Mr. Gersten pursuant to his rights of subrogation. Accordingly, the full amount of Republic's debt must be included as a liability under the DCL § 271 test.

### Gersten and Cron Debt

For the reasons I have stated above in relation to the Republic debt, I cannot accept that either Mr. Gersten's or Mr. Cron's debt should be excluded because it was long term. There is no requirement that debts be "absolute and matured" to be included as liabilities for purposes of determining insolvency under DCL § 271. For the same reason, it is irrelevant that Mr. Gersten "did not intend to enforce [his] debt so long as Centennial owed money to other creditors." Mr. Cron's debt should not be reduced because of Mr. Gersten's guarantee for the same reason that the Republic debt should not be reduced by reason of the Pledge.

### Inventory

■ As Mr. Gersten correctly argues, book value and fair salable value measure different things and book value does not establish fair salable value. *See Morgan Guaranty Trust Co. v. Hellenic Lines Ltd.,* 621 F.Supp. 198, 220 (S.D.N.Y.1985); *Rego*

**3.** Currently 11 U.S.C. § 101(32).

*Crescent Corp. v. Tymon (In re Rego Crescent Corp.),* 23 B.R. 958, 968 (Bankr. E.D.N.Y.1982); *Seligson v. New York Produce Exchange,* 394 F.Supp. at 128–32. The market value of assets may be greater or less than their book value. *See Morgan Guaranty Trust Co. v. Hellenic Lines Ltd.,* 621 F.Supp. at 220. Generally accepted accounting principles ("GAAP") do not control a court's decision. *See In re O'Day Corp.,* 126 B.R. at 398; *In re Ohio Corrugating Co.,* 91 B.R. 430, 438 (Bankr.N.D.Ohio 1988). In spite of their propriety according to GAAP, a court may modify balance sheet entries (i.e., increase/decrease the value of an asset or reduce/elevate the amount of the liability) in order to more accurately reflect the financial condition of the Debtor. *See In re Ohio Corrugating Co.,* 91 B.R. at 438 n. 11 (citing *In re Arrowhead Gardens, Inc.* 32 B.R. 296 (Bankr.D.Mass.1983)). However, the court is inclined to assign presumptive validity to the treatment of assets and liabilities according to GAAP. *See In re Ohio Corrugating Co.,* 91 B.R. at 438.

■ Mr. Gersten's argument in relation to the value of the inventory is, however, fundamentally flawed because it assumes all inventory to be finished goods. In fact, the notes to the 1995 Statement reflect inventory consisting of raw materials valued at $11,650,-710, work in process valued at $1,651,000 and finished goods valued at only $4,798,355 (total $18,100,065). The notes to the February 1996 Statement reflect inventory consisting of raw materials valued at $6,828,000, work in process valued at $5,021,000 and finished goods valued at $6,091,000 (total $17,940,000). No such breakdown is provided in the notes to the May 1996 Statement. The notes to the Statements further indicate that inventories are valued at the lower of cost (first-in, first-out) or market. Mr. Gersten cannot seriously be contending that all inventory, including raw materials and work in process, is salable at 15% above cost.[4] At best, only finished goods could be so valued. A 15% mark up on finished goods would reduce the deficit claimed by the Trustee by $719,753 as of May 31, 1995 and $913,650 as of February 2, 1996.

However, the evidence submitted by Mr. Gersten in support of his claim that inventory was salable at 15% above cost, the sales analyses exhibited as Exhibit A to Mr. Bernstein's affidavit of January 22, 1998, falls well short of establishing that proposition in the light of other available evidence. These monthly sales analyses from May 1995 through January 1996 purport to show average gross profit percentages on sales of "$50,000 & over" as follows:

| Month | Gross Profit % | Amount $ | Month | Gross Profit % | Amounts $ |
|---|---|---|---|---|---|
| MAY 1995 | 14.99 | 2,645,774 | OCT 1995 | 16.79 | 2,876,907 |
| JUNE 1995 | 17.36 | 3,099,963 | NOV 1995 | 15.28 | 2,996,094 |
| JULY 1995 | 12.92 | 1,795,371 | DEC 1995 | 10.14 | 3,526,586 |
| AUG 1995 | 17.02 | 3,118,788 | JAN 1996 | 12.59 | 3,719,597 |
| SEP 1995 | 34.08 | 2,477,986 | MONTHLY AVERAGE | 16.80 | 2,917,452 |

According to figures in the February 1996 Statement, net monthly sales for the nine month ended February 29, 1996 averaged $5,408,287. Thus, it would appear that only 54% or so of sales fell into the category of "$50,000 & over." Mr. Gersten has presented no evidence as to gross profit on other sales. However, the figures shown in the statement of operations in the February 1996 Statement show an overall gross profit percentage for the nine month period of only 10.1%. Comparable figures from the 1995 Statement shows an overall gross profit percentage for the year of only 8.3% and comparable figures from the May 1996 Statement

4. In fact, raw materials and work in process would undoubtedly be salable below cost, although I do not assume this for the purposes of this decision.

shows an overall gross profit percentage for the year of only 3.5%.

Thus, although Mr. Gersten might be able to establish at trial that the $1,387,407 deficit reflected in the 1995 Statement balance sheet should be adjusted by allowing a credit with respect to mark up on finished goods inventory and $650,000 with respect to trade liabilities, there would nevertheless remain a deficit and a balance sheet insolvency. In fact, even allowing for a 15% mark up, there would be a $17,654 deficit. Likewise, at the end of February 1996, in accordance with the foregoing, Centennial was clearly insolvent since the possible credits with respect to inventory and trade liabilities do not come close to wiping out the deficit of $2,059,784 reflected in the February 1996 Statement. The date the Policies were transferred fell between May 31, 1995 and February 29, 1996 but Mr. Gersten has raised no argument that Centennial's financial position improved in any way after May 31, 1995. Similarly, Mr. Gersten has shown no triable issue as to Centennial's insolvency at the date of the Premium Payments. Thus, I need not address the Trustee's argument that gross sales figures must be adjusted to reflect the cost of selling goods.

**Trustee's Standing**

As I have stated, § 544(b) of the Code enables a trustee to avoid any transfer of an interest of the debtor in property that is avoidable under applicable law by a creditor holding an unsecured claim that is allowable under § 502 of the Code. The Trustee has amply shown that there are a number of such creditors and this is not an issue for trial.

**Remedies**

DCL § 278 provides:

1. where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such purchaser,

   a. have the conveyance set aside or obligation annulled to the extent necessary to satisfy his claim . . .

N.Y.Debt. & Cred.Law § 273 (McKinney 1990). Pursuant to § 550(a)(1) of the Code, to the extent that a transfer is avoided under, *inter alia*, § 544 of the Code, a trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property from the initial transferee. Although the Trustee here seeks entry of a judgment against Gersten for the alleged cash surrender value of the Policies—$317,179.00—plus interest thereon since November 23, 1995, plus the amount of the Premium Payments—$25,885.05—plus interest thereon and entry of a judgment requiring and directing MBL to transfer and turn over the Policies to the Trustee as property of the estate, he cannot be entitled to both, which would represent a double recovery.

According to the Trustee, $317,179.00 represents the cash surrender value of the Policies as at May 31, 1996 "adjusted to reflect the current value thereof." Mr. Gersten complains that the cash surrender values of the Policies at the time of the transfers were significantly reduced by moratorium charges imposed by MBL. A letter from MBL dated December 29, 1997 puts the cash surrender value of policy no. 7,050,385 as at November 1995 at $186,034.95. Similar information is not yet available with respect to policy no. 7,057,489. *Prima facie*, then, there is a triable issue as to the value of the Policies. However, such issue would become moot if I were to order that the Policies be reconveyed to Centennial.

Section 550(a) is intended to restore the estate to the financial condition it would have enjoyed if the transfer had not occurred. *See Morris v. Kansas Drywall Supply Company, Inc. (In re Classic Drywall, Inc.)*, 127 B.R. 874, 876 (D.Kan.1991); *Aero–Fastener, Inc. v. Sierracin Corp. (In re Aero–Fastener, Inc.)* 177 B.R. 120, 139 (Bankr.D.Mass.1994); *Pritchard v. Brown (In re Brown)*, 118 B.R. 57, 60 (Bankr. N.D.Tex.1990); *Tidwell v. Chrysler Credit Corp. (Matter of Blackburn)*, 90 B.R. 569, 573 (Bankr.M.D.Ga.1987). However, since the Bankruptcy Code does not provide guid-

ance on when the Court should order payment of the value of property rather than order the return of property itself, it is within the Court's discretion to make such a determination. *See In re Aero–Fastener, Inc.* 177 B.R. at 139. *See also In re Classic Drywall, Inc.*, 127 B.R. at 877; *First Software Corp. v. Computer Associates Int'l, Inc. (In re First Software Corp.)*, 107 B.R. 417, 423 (D.Mass.1989); *Gennrich v. Montana Sport U.S.A., Ltd. (In re International Ski Service, Inc.)*, 119 B.R. 654, 656 (Bankr. W.D.Wis.1990); *Burtrum v. Laughlin (In re Laughlin)*, 18 B.R. 778, 781 (Bankr.W.D.Mo. 1982). The factors which the Court should consider in determining whether to order turnover of the property rather than payment of the value include whether the value of the property (1) is contested; (2) is not readily determinable; or (3) is not diminished by conversion or depreciation. *See In re Aero–Fastener, Inc.*, 177 B.R. at 139; *In re Classic Drywall, Inc.*, 127 B.R. at 877. These factors here militate in favor of turnover of the Policies to the Trustee. Accordingly, the value of the Policies is not an issue for trial.

### Conclusion

Mr. Gersten has failed to show that there are any genuine issues of fact regarding fair consideration or Centennial's solvency or any other material fact warranting a trial. The Trustee's motion for summary judgment is granted in accordance with the foregoing. The Trustee is directed to settle an order accordingly.